FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

01 JAN 25 PM 3: 00

U.S. DISTRICT COURT
N.D. OF ALABAMA

LINDA JO McCONNELL, et al.,       )
                                  )        **ENTERED**
         Plaintiffs,              )        *JAN 2 5 2001*
                                  )
vs.                               )        Case No. CV 86-TMP-5024-NE
                                  )
ALABAMA FEDERAL SAVINGS           )
AND LOAN ASSOCIATION,             )
                                  )
         Defendant.               )

## FINDINGS OF FACT and CONCLUSIONS OF LAW

After almost fifteen years of litigation, the court conducted a sixteen-day non-jury trial during November 2000 on the claims of the thirteen[1] remaining opt-out plaintiffs, Merredith Moody Smith, Dorothy Gurley, Nancy J. Martin, Sharon Waine McQueen, Joan Lacy Gargus, Betty Putman, Shirley Williams, Mary Hill, Carol Manning Woodruff, Alys Liddy, Kathryn Robertson, Jean Bryant Piersol, and Gail Figg. Below are the court's findings of fact and conclusions of law determining that plaintiff's Joan Lacy Gargus, Carol Manning Woodruff, Alys Liddy, Kathryn Robertson, and Gail Figg are entitled to recover various sums as back-pay awards, plus interest. The remaining plaintiffs have failed to establish an entitlement to

---

[1] In preparing these findings, the court had the opportunity to review the summary judgment memorandum opinion entered in March 2000. To its chagrin, the court discovered that, by error and oversight, it had granted summary judgment in favor of the bank and against another opt-out plaintiff, Laura H. Posey, after having found that there were genuine issues of material fact precluding summary judgment against her. Consequently, plaintiff Posey's claims have not been tried, although she deserves to have one.

530

recovery, and judgment will be entered for the bank and against them in a separate order.

Findings of Fact

I. **History of Alabama Federal**

1. Alabama Federal Savings and Loan Association was formed on April 1, 1982, by the merger of four savings and loan associations, Heritage Federal Savings and Loan in Tuscaloosa, Security Federal Savings and Loan in Huntsville, Home Federal Savings and Loan in Birmingham, and Home Savings and Loan in Mobile. These four institutions were distinct savings and loan associations with separate assets, deposits, and management prior to the merger. At the time of the merger, they were led by their respective presidents, Winston Porter (Home Federal), John Cade (Heritage Federal), W.E. "Buddy" Petty (Security Federal), and Ernest Todd (Home Savings). Heritage Federal was viewed as the largest and most dominant institution involved, so after the merger John Cade became president/CEO of the new Alabama Federal, with the remaining presidents assuming positions as regional managers, also known as regional presidents.

2. Alabama Federal was organized into four regions, plus a corporate office. Branches of the old Security Federal were designated as the Northern Region or Division, headquartered in Huntsville; branches of the old Home Federal were made the Central

2

Region or Division, headquartered in Birmingham.  Branches of the old Heritage Federal were made the Western Region or Division, headquartered in Tuscaloosa, and branches of the old Home Savings were made the Southern Region or Division, headquartered in Mobile. Under the corporate offices, initially in Tuscaloosa but later moved to Birmingham, each region or division also had a distinct management structure headed by a regional manager or regional president with a hierarchy of management under the regional manager.

3.  The months following the merger in 1982 and into 1983 and 1984 were tumultuous for Alabama Federal.  Difficulties were encountered in the process of consolidating the four separate accounting, checking, and mortgage-lending functions of the old institutions into one unified function in Alabama Federal.  The conversion of the separate computer systems into one system caused great problems for several years until an entirely new computer system was purchased for the merged institutions.  A plan for a public stock offering went awry in April 1983, causing disruption among the directors and officers of Alabama Federal, leading to several directors and officers being fired or removed.  In this upheaval, Cade was removed as Chairman and CEO, being replaced as chairman by Jack Shannon.  Eventually, James Gambill was made the CEO.  The Board of Directors, once dominated by the Tuscaloosa

3

interests inherited from the old Heritage Federal, was restructured more in favor of non-Tuscaloosa directors.

4.   Additionally, there was a great deal of overlap in functions caused by a surplus of personnel.   When the four institutions merged, each brought a similar set of officers -- comptrollers, vice presidents, senior vice presidents, executive vice presidents -- who had to be assigned to new positions or reduced through attrition.   While many officers remained in divisional positions, the overall corporate officer hierarchy had to be reshuffled to eliminate duplicate positions and responsibilities.

5. Alabama Federal experienced relatively rapid growth over the next several years, primarily through merger and acquisition. Immediately after the April 1, 1982, merger that created Alabama Federal, it acquired the First Federal Savings and Loan Association in Fayette, Alabama, on July 1, 1982.   Five years later, in December 1987, Alabama Federal acquired two large Louisiana savings and loan associations, First Federal Savings in Slidell and First Financial Bank in New Orleans, that doubled the size of Alabama Federal's workforce and corporate structure.   Acquisitions continued when, in September 1988, it bought out Coosa Federal Savings and Loan Association in Gadsden, Alabama, and in November 1988 it acquired Twin City Federal Savings and Loan Association in

4

Monroe, Louisiana, and Cypress Savings Association in Plantation, Florida.

6.   The Equal Employment Opportunity Commission charge of discrimination filed by the original plaintiff, Linda Jo McConnell, and on which all claims in this action are based, was dated April 24, 1985, and received by the Equal Employment Opportunity Commission on April 30, 1985.   The charge raised only one essential claim: that she was discriminatorily denied a promotion to senior loan officer based on gender on April 1, 1985.   When the class of all female employees of Alabama Federal was certified after the filing of this action in January 1986, it covered

> all women who were permanently employed by the defendant at any time since April 24, 1983, and were adversely affected in hiring, promotions, transfers, job assignments, pay and other terms and conditions of work because of their sex.   "Permanently employed" is defined to mean female employees who were continued with employment with the defendant after the 90-day probationary period.

7.   For those members of the class who did not wish to avail themselves of the class settlement, the consent decree entered by the court allowed for opt-outs.   Members of the class wishing to opt out were required to file a claim with the court by May 1, 1988.   Each of the thirteen opt-out plaintiffs involved in this trial did so.

5

## II.  Plaintiffs' Employment Histories

8.  Plaintiff Merredith Moody Smith was first employed by Alabama Federal's predecessor entity, Home Federal Savings and Loan Association (hereinafter "Home Federal"), as a teller in June 1969. She had graduated from high school and had attended Jacksonville State University for one year.  She was interviewed first by Ron Smith and then by Winston Porter, the president of Home Federal, who hired her.  She was not aware, nor was she informed, that Home Federal had a "management trainee" program for entry-level hiring. After being hired, plaintiff did not continue her college education, although she did participate in classes sponsored by the Institute of Financial Education.

9.  On November 17, 1969, several months after plaintiff was hired, Ronny Hudspeth was hired as a "management trainee" before being named the branch manager of the Center Point branch of the association on March 1, 1970.  At the time of his hiring, Hudspeth had graduated from high school and was attending college part-time at the University of Alabama in Birmingham.  Between high school and being hired at Home Federal, Hudspeth worked in the accounting department at Marshall Durbin.  He continued in college part-time until 1973, when he became a full-time student, ultimately earning a bachelor's degree in 1978, while also continuing to work full-time.  The Center Point branch was opened in 1970, as Home

Federal's first branch office, with Hudspeth as its first branch manager.

10.  Plaintiff Smith was transferred to the Hoover branch, the association's second branch, as a teller in 1972, where she was involved in training tellers and "management trainees." The branch manager was Mike Boyd. He was first employed by Home Federal as a "management trainee" in 1971. He received a college degree in aviation management from Auburn University in 1970 and had worked as a golf pro between college and being hired at Home Federal. After completing management training in October 1971, he was assigned to be the branch manager at the Forestdale branch. In 1972, he was transferred to the Hoover branch.

11.  In 1974 plaintiff Smith was promoted to assistant branch manager, still under the supervision of Boyd. In 1977, after contacting Ron Smith, the Executive Vice President of Branch Operations, to express her interest in being considered for a branch manager's position, she was promoted to branch manager of the Eastwood branch of Home Federal. Boyd recommended her for promotion to branch manager. Upon her promotion, she was informed by Ron Smith that Hudspeth, as a branch supervisor, would be her direct supervisor and would perform her annual employee evaluation.

12.  In 1974, both Ronny Hudspeth and Mike Boyd were branch supervisors, in addition to being branch managers at Center Point and Hoover, respectively. Branch supervisors were assigned

7

supervisory responsibility over branches other than their own, working with and evaluating the branch managers under their supervision.  In addition to managing his own Center Point branch, Hudspeth also supervised plaintiff's Eastwood branch and branches at Leeds, Roebuck, Wetumpka, and Dothan.  Boyd managed his Hoover branch and supervised branches at Five Points West, Bessemer, Forestdale, Brookwood, and Decatur.

13.  Under the Home Federal structure, there were three types of branches: limited-service branches that offered only savings account services; full-service branches that offered savings, lending, and other banking functions; and "remote" or "out-of-town" branches that operated almost entirely independently of Home Federal's home office, including mortgage loan origination, processing, approval, and servicing.  The "remote" branches were in cities distant from Birmingham, including Dothan, Decatur, Wetumpka, and Selma.  Managers of "remote" branches required and received less supervision than other, non-remote branch managers, and they exercised greater independent authority.

14.  Plaintiff Smith worked as branch manager at Eastwood from 1977 through the merger in 1982 that created Alabama Federal, and until she left Alabama Federal on January 31, 1985, to go to work for New South Federal Savings and Loan Association.  As a branch manager, she was responsible for the efficient operation of the branch, including training personnel and handling savings-account

8

and lending functions.  In the area of lending, all branch managers had authority to make "share loans," or loans secured by the borrower's deposits in accounts in the association.  From 1977 until the early 1980s, savings and loan associations were not allowed to make consumer loans, only home mortgage loans. Plaintiff and other branch managers originated, processed, closed, and serviced home loans that were approved by a central loan committee.  "Remote branch" managers, however, had their own loan approval authority.

15.  "Remote branch" managers had significantly more duties and responsibilities than "full service" branch managers.  "Remote branch" managers were isolated, in communities distant from the Home Federal main office.  They were required to exercise more judgment and authority in both savings and lending functions by using their own loan approval authority.  "Remote branch" managers were required to market and promote the association in their communities to a much greater degree than "full service" managers. Because they received little support from the main office, they acted as "local presidents," being the face of the association in their respective communities and active in civic organizations and functions.  "Remote branch" managers had loan-production and savings goals they were expected to meet; they were required to make sales calls on realtors and builders to originate home lending business.  "Full service" branch managers were not required to make

9

sales calls or make loan approval decisions.  When federal banking regulations changed in the early 1980s to allow savings and loan associations to make consumer loans, most branch managers had some limited authority to make secured and unsecured consumer loans, but that authority was for significantly larger loan amounts for "remote branch" managers.

16.  The mortgage lending philosophies of Home Federal before the merger and Alabama Federal after the merger were different. Home Federal decentralized mortgage lending, allowing branch managers to accept applications and close the loans approved by the loan committee.  This provided convenience to the customers by allowing them to work with one contact, the branch manager at the branch office.  After the merger in 1982, however, Alabama Federal took a completely opposite philosophy of centralizing the mortgage lending functions in a central office.  While branch managers still were allowed to take loan applications, the applications were sent to the central mortgage department in the main office for processing, approval, closing, and servicing.

17.  Centralization of consumer lending also took place after the merger.  In February 1984, Tom Allen was hired by Alabama Federal to be a consumer loan coordinator for the Central Division, replacing Larry Harris, who held the position before he did.  He became mortgage construction loan supervisor in 1985 and then construction loan manager in 1986.  He held the latter position

10

until he left the bank in 1988.  Percy Phillips and Steven Durel held similar consumer loan positions in the Northern and Western Divisions.  The purpose of the consumer loan coordinator was to receive consumer loan applications taken by branch managers, analyze the proposed loan, and approve or reject the loan within certain limits.  Allen could approve unsecured loans up to $5,000 and secured loans up to $25,000.  In the roles of construction loan supervisor and manager, his job was to originate, process, analyze, and submit for approval by the regional loan committee loan applications for construction loans.  After the construction loan was approved and closed, he monitored the construction to make sure that it was progressing on schedule with the loan pay-outs.

18.  After the merger in 1982, "full-service" branch managers no longer held consumer loan approval authority, except for "share" loans.  Analyses of loan applications were done by Allen, not the full-service managers.  All loan files and processing were kept at the central divisional office, not at the individual branches.  Although Allen never heard the term "remote" branch managers, managers of certain distant branches -- Wetumpka, Dothan, Florence, Decatur, and Selma -- had independent loan approval authority for all types of loans, consumer, construction, and mortgage loans.  Unlike "full service" branch managers, managers at these distant branches were not only given approval authority, but were also expected to originate loans to meet certain goals and to perform

11

the analyses necessary for approving or rejecting the loan. Managers at these distant branches did their own closings and maintained their own loan files.

19. Plaintiff Sharon Waine McQueen was first hired at Alabama Federal after the April 1982 merger. Plaintiff was hired as a switchboard operator and receptionist on June 1, 1983. At the time, she had a high school diploma and one year of college at Jefferson State Junior College. She was not aware of any "management trainee" program or positions. She quickly was promoted to a teller position and, by January 1984, promoted to head teller at Alabama Federal's downtown Birmingham office. The next month, in February 1984, she became a "floating" savings counselor, filling in as needed at various branches in the Birmingham area. In mid-1984, Hudspeth became Executive Vice President of the Central Region, effectively replacing Winston Porter, the regional manager, who left to form his own bank. In early 1985, Hudspeth asked her to become a "floating" branch manager, filling in for absent branch managers on leave or vacation. She was under the direct supervision of Nelda Phurrough.

20. In June 1985, the branch manager's position at the Forestdale branch opened, and Hudspeth asked her to take the position. Plaintiff McQueen trained with the old manager for about one week, and she received a pay increase. She never received a job description for branch manager, nor was she aware of any

distinctions among branch managers, except between "full service" and "satellite" (limited service) offices. Plaintiff's duties at Forestdale included opening the branch and assuring its efficient operation. In mortgage lending, she talked to customers about rates, mailed rate sheets to builders and realtors, and received mortgage applications from customers. Actual processing, closing, and servicing of loans, however, had been centralized in the main office, and branch managers no longer were actively involved in loan processing, closing, or servicing. Plaintiff McQueen's role was limited to accepting loan applications and coordinating between the customer and the central loan office.

21. In September 1985, plaintiff's Forestdale branch was robbed at gunpoint. This so disturbed plaintiff that she took a week off from work, found another job, and resigned upon her return. Because she was entitled to certain leave, her resignation was effective in October 1985.

22. During much of plaintiff Smith's employment with Alabama Federal, she was required to wear a "uniform" or ensemble supplied by the bank. Plaintiff McQueen made no mention of wearing a uniform. Neither Smith nor McQueen was supplied with a company car or had their dues to civic or social organizations paid by the bank. "Remote branch" managers' dues to civic organizations, like Sertoma, were paid by the bank, but "full service" branch managers were not required to participate in civic organizations to the same

13

extent as "remote branch" managers were.  "Remote branch" managers were expected to raise the profile of the bank in their distant communities by being a community leader.  Because their branches were in communities removed from Birmingham, "remote branch" managers were the personification of the bank, and the success of the bank in that community was directly related to the reputation and activities of the manager.

23.  Plaintiff Dorothy Gurley worked for Security Federal Savings and Loan Association in Huntsville, Alabama, another predecessor to Alabama Federal before the April 1982 merger.  She started at Security Federal in December 1972, when Security Federal president Joseph Hoskins recruited her away from a competitor savings and loan.  She had worked intermittently in the banking industry since 1945.  She started at Security Federal as a teller and worked in that position until she was promoted to branch manager of the Oak Park branch in 1974 or 1975.  She continued working at Oak Park through the merger in April 1982, until she resigned on August 2, 1985.  Although Security Federal agreed in 1978 to pay for further training for plaintiff, she never took advantage of any continuing education or training opportunities.

24.  When plaintiff Gurley first became a branch manager, no lending was done at the branches, except for "share loans."  Her duties consisted of opening and closing the branch, handling savings accounts, making sure the branch had adequate operating

capital, making the branch's deposit at its bank, and completing a daily bookkeeping report to the main office in Huntsville. Later, in the early 1980s, banking regulations were changed to allow savings and loan associations to make consumer loans. Even then, she took applications and appraised collateral, but the loan file was then forwarded to Percy Phillips, a loan officer, for approval. No mortgage loans were originated, processed, or closed at Security Federal branches. She wore a uniform, or ensemble, supplied by the bank, but did not have a company car.

25. At the time of the merger that created Alabama Federal in April 1982, Security Federal had branches at Oak Park, Lily Flagg, Madison, and Whitesburg, in addition to the main office in downtown Huntsville.

26. Percy Phillips was hired by Security Federal on August 14, 1978, as a loan officer being paid $15,275.00. At the time of his hiring, Phillips had an associate degree in banking and finance from John C. Calhoun Community College and over seven years of experience as a branch manager or loan officer. Either before or by no later than the 1982 merger, Phillips rose to the position of vice president of consumer loans before resigning in January 1986.[2] His annual pay at the time was $16,200.00. Darlene Brooks

---

[2]   Although the evidence is less than clear, the court concludes that Phillips was promoted to vice president of consumer loans at about the same time as Jack Manning was promoted to Vice president and senior loan officer in 1980.

Hill was hired to replace him as consumer loan officer and was paid $20,700 per year.

27.   Jack Manning was hired by Security Federal in 1975 as an assistant loan officer.  His advancement included promotions to loan officer in 1976, assistant vice president and loan officer in 1978, and vice president and senior loan officer in 1980.  At the time of the merger in 1982, he became senior vice president over the loan department in the Northern Region.  In 1983, he became executive vice president over the loan department in the Northern Region and, later, assistant managing officer for the entire Northern Region, which made him second only to the regional president, Buddy Petty.  Ultimately, Manning became Vice President/Regional Manager of the Northern Region when Petty left in 1985.

28.   Plaintiff Nancy Martin joined Security Federal in September 1975 as a teller at the Whitesburg branch.  At the time, she had a high school diploma and three years experience as a teller and head teller with another bank.  Three months later, she was promoted to branch manager of the Madison branch.  During the period of her employment, Martin took 15 to 20 continuing education courses with the Institute of Financial Education, completing two diploma levels.  Plaintiff managed the Madison branch for nine years, through the merger in 1982, and until she resigned in August 1984.  Her duties as branch manager did not include hiring or firing branch personnel.  She was involved in consumer loans, but

16

only upon approval by Percy Phillips.  Beginning in 1976, she took real estate loan applications, processed the credit reports, and forwarded the file to mortgage loan officers Randy Dixon and, later, Jack Manning for approval of the loan.  She was paid a commission for each real estate loan she originated.  She resigned in August 1984.

29.  The merger in 1982 created a new network of branches, organized around the divisional or regional concept.  Branches formerly of one predecessor savings and loan were restructured under the new network.  For example, the Decatur branch originally was part of the Home Federal system, but was transferred to the Northern Division of Alabama Federal after the merger, placing it under the control of the main divisional office in Huntsville, which formerly was Security Federal.  Similarly, branch offices in the Quad-Cities (Florence, Muscle Shoals, Sheffield, and Tuscumbia), originally part of the Heritage Federal system in Tuscaloosa, also were transferred to the Northern Division. Differences in the way these formerly unassociated branches were operated became apparent upon their transfer to new supervision.

30.  During the pertinent time frame of this litigation from April 1983 to May 1988, other branch managers were Tom Macon at Wetumpka; Jim Ross at Dothan, who was followed by Ken Long at Dothan; Carlos Pressnell at Decatur, followed by Dee Hillis at Decatur; and John Alexander in the Quad-Cities.

31.   Tom Macon was first hired by Home Federal in 1975 to be the branch manager of the newly-opened Wetumpka branch.   He remained through the merger, but resigned on December 31, 1984. Wetumpka was regarded as a "remote" or "out-of-town" branch because it was distant from Home Federal's Birmingham home area.   The evidence does not reveal who followed Macon as the Wetumpka branch manager.

32.   Jim Ross was hired by Home Federal in 1975 when the Dothan branch was opened.   He was hired to be the branch manager. Dothan was regarded as a "remote" or "out-of-town" branch because of its distance from Birmingham.   He resigned in April 1985. Following his resignation, Ken Long was hired as the Dothan branch manager on May 6, 1985, but he was terminated for unsatisfactory performance only a year later, on May 15, 1986.   The evidence does not reveal who followed Long as the Dothan branch manager. Although the Dothan branch originally was opened by Home Federal, after the merger, administrative supervision of that branch was transferred to the Southern Division of Alabama Federal in Mobile under Ernest Todd as the regional manager.   The operations officer in the Southern Division was Twynette Ellis, a woman.

33.   Carlos Pressnell was hired by Home Federal in 1978 to be the branch manager at the new Decatur branch.   It too was regarded as a "remote" or "out-of-town" branch.   After the merger, he was terminated for poor loan-production performance on July 9, 1985.

18

At the time, he was being paid about $17,000 per year.  In November 1985, Dee Hillis was hired as the Decatur branch manager at an annual pay of $20,000.  She remained at Decatur until she was transferred to the Oak Park branch in 1987 and replaced in Decatur by Darlene Brooks.

34.  John Alexander originally was hired by Home Federal, headquartered in Birmingham, as a staff appraiser in 1978.  He held a college degree from the Louisiana State University banking school.  His starting pay was $700 per month, or $8,400 per year.  In staff appraising, he spent time learning mortgage lending from Jim Maples and Gregg Scott.  He later spent time working in various branch offices, including Center Point, to learn branch operations.  In 1979, Alexander was promoted to the position of branch manager at the Bessemer branch.  After about ten months, he transferred to Home Federal's only branch in Tuscaloosa in 1980.  The Tuscaloosa branch was a "remote" full-service branch, doing savings and mortgage lending.  As branch manager, he was active in the Tuscaloosa Home Builders Association and the Board of Realtors in order to solicit additional mortgage lending business.  With the merger in 1982, the old Home Federal branch was closed and Alexander transferred to the main office of the Western Division of Alabama Federal in Tuscaloosa, which formerly was Heritage Federal.  There, he worked variously as a customer service clerk and a loan

officer.    Ultimately,  Bev  Leigh  assigned  him  to  solicit construction loan business from builders.

35.  John Adams was employed as a loan officer and collections officer in the Quad-Cities branches during the relevant time-frame from 1983 to 1988.  He never worked as branch manager, always being under the supervision of either Ken Reynolds or John Alexander.  In this position, Adams solicited mortgage loan applications through builders and realtors, originated mortgage loans, and supervised the loan processors in the Quad-Cities branches.

36.  In early 1984, Alexander was transferred to the Quad-Cities to manage the four Alabama Federal branches there, replacing Ken Reynolds, who was moving to Birmingham.  In July 1985, Alexander was offered a position with a competing bank in Decatur. To keep him, Alabama Federal CEO Jim Gambill increased his pay to $32,000.  He held the title of vice president and Shoals area manager, and he was responsible for the overall operation of four branch offices in Florence and Muscle Shoals.  He supervised branch managers at each of the four branches and a total of 20 to 25 employees.  As a "remote" branch, the Quad-Cities branches made their own loans, totaling about $35 to $40 million per year. Alexander resigned in February 1987 when he and several other employees were made loan originators, paid on commission rather than salary.

37.    The following chart reflects the plaintiff branch managers, certain other male branch managers, and their rates of pay at the time of and after the 1982 merger:

| Name | Became Branch Mgr | Branch | Pay: 1984 Rate | 1985 Rate |
|------|-------------------|--------|----------------|-----------|
| Dorothy Gurley | 1974/5 | Oak Park | $11,400 | $12,400 |
| Nancy Martin | 1975 | Madison | $11,400 | --- |
| Merredith M. Smith | 1977 | Eastwood | $14,352 | $15,370 |
| Sharon W. McQueen | 1985 | Forestdale | * | $8,825 |
| Tom Macon | 1975 | Wetumpka | $24,009 | --- |
| Jim Ross | 1975 | Dothan | $23,562 | --- |
| Carlos Pressnell | 1978 | Decatur | $17,940 | $17,870 |
| John Alexander | 1979 | Quad-Cities | $32,512 | $35,818 |
| Ken Long | 1985 | Dothan | --- | $27,000 |

Although plaintiff McQueen was employed by Alabama Federal before 1985 as a receptionist and teller, she first became a branch manager in 1985.

38.    Plaintiff Alys Liddy was hired in the Western Division office of Alabama Federal in Tuscaloosa in February 1984.  Some years earlier she had worked at Heritage Federal, a predecessor to Alabama Federal, just after she graduated from high school.  For more than ten years before her most recent hiring, however, she worked for a real estate broker as a secretary and office manager.  In that role, she met and worked with many real estate professionals and builders in the Tuscaloosa area.  She also was

21

known to many of the people at Alabama Federal through her position in the real estate business.

39.  In February 1984, Bev Leigh, the head of the loan department in the Western Division, called to offer her a position as a "loan officer" at Alabama Federal.  The position was available because the previous loan officer, John Alexander, had been promoted to manager of the Quad-Cities branches and had moved to Florence.  She ultimately accepted, but was given the title of "loan counselor," and paid at the rate of $10,400 per year, although she performed all of the duties identified in the job description for "loan officer."  At the time, the Western Division loan department staff consisted of Bev Leigh, loan officer Virginia Wheeler, and plaintiff Liddy.  Plaintiff accepted loan applications, processed the applications, and presented them to the divisional loan committee, of which she was a voting member.  She also reviewed and presented to the loan committee virtually all mortgage loan applications originated in the branch offices in Livingston, Selma, Butler, and Fayette.  She once asked Bev Leigh why she had the title of "loan counselor" and how it was different from "loan officer," but received no explanation.

40.  In the meantime, in January 1985, the bank hired Tom Cobb as the "Vice President-Lending" for the Western Division to head up all lending functions, both real estate mortgage and consumer lending.  Cobb had a degree in banking from Livingston University

and had experience in lending as a loan officer and an assistant manager of a credit union. Cobb was hired to fill Bev Leigh's former position after Leigh was promoted to Regional Manager. Cobb supervised all lending personnel, including loan originators, mortgage loan staff, and consumer lending staff. He approved consumer loans and participated on the mortgage loan approval committee. He set rates for both consumer and mortgage loans. Cobb was terminated in January 1987 in a reduction-in-force, resulting in his position of Vice President-Lending for the Western Region remaining unfilled.

41. In March 1985, the bank also hired John Marbury as a "loan counselor," the same position then held by plaintiff, and paid him at the rate of $15,000. Marbury was the son of one of the bank's directors and was essentially "thrust" on the bank as an employee. His duties were not different from those performed by plaintiff Liddy. In February 1986, Marbury transferred to AlaFed Mortgage, a financing subsidiary of Alabama Federal in Birmingham, to take a position as a "loan solicitor." As a loan solicitor, he was paid on commission with a draw of $15,000.

42. In April 1985, Virginia Wheeler was made an "outside loan solicitor," paid on commission. Plaintiff Liddy was then promoted to Wheeler's old position of "loan officer," with a pay raise to $12,900. She also inquired about being made a commissioned "outside loan solicitor" like Wheeler, but was told there was no

23

room for two solicitors in Tuscaloosa.  She never expressed any interest in transferring to another city to take such a position.

43.  On October 6, 1986, Tom Siemers was hired by then-CEO James Gambill to become the Western Regional Manager, replacing Bev Leigh who was being demoted to "senior lender."  With the termination of Cobb in January 1987, a vacuum in loan supervision was created.  Siemers recommended that plaintiff Liddy be promoted to the position of "mortgage loan production supervisor" and be given a pay increase to $19,000.  Plaintiff took over supervision only of mortgage loan production, not consumer loans, which were put under the supervision of Rhonda Denton.  Upon being promoted, plaintiff moved into the office formerly occupied by Cobb and began exercising some, but not all, of the responsibilities he held. This promotion also put plaintiff in a supervisory capacity over the mortgage loan processing staff, her first supervisory position.

44.  In 1987, Nancy Howlington was brought into the western division office to supervise plaintiff, who was essentially demoted in September 1987 to the position of "loan processor."  Soon thereafter, in December 1987, plaintiff resigned to take employment at a competitor bank.

45.  Plaintiff Kathryn Robertson first went to work for Heritage Federal in September 1979 as a drive-thru teller.  At the time, she had a high school diploma and had taken "a few" college level courses.  She had worked as a head cashier in a grocery,

24

requiring her to balance receipts and registers.  In early 1980, she became a "front-line" teller, assisting customers with deposits and withdrawals, opening accounts, typing "share" loan documents, and calculating penalties for early withdrawals.  Plaintiff eventually became head teller in the Tuscaloosa main office of Heritage Federal, with supervisory authority over other tellers. She made recommendations concerning hiring, firing, and pay of tellers.

46.  In March 1983, after the April 1982 merger that created Alabama Federal, plaintiff Robertson assumed the position of escrow clerk in the Western Division office in Tuscaloosa.  In this position, she monitored the collection and payment of insurance and taxes as an escrow item on the bank's mortgage portfolio, making sure that mortgage customers were paying enough into their escrow accounts to cover the insurance and taxes for their homes and, in turn, assuring that the taxes and insurance were paid on time out of the escrow account.  In 1984, she was promoted to escrow supervisor, placing her in a supervisory position over escrow clerks.  As escrow supervisor she also became involved in construction loans, writing checks to builders out of construction-loan escrow accounts based on the percentage of completion of the construction.  This required her to begin inspecting construction and meeting with builders.  From those meetings, she originated some permanent financing of construction loans by assisting

builders in converting construction loans to permanent loans. She took the loan applications, processed the loans, and presented them for approval to the loan committee. In 1985, however, escrow and loan servicing was centralized in the main corporate office in Birmingham.

47. Plaintiff Robertson held the position of escrow supervisor until February 1986, when John Marbury transferred to Birmingham to be a loan solicitor. Tom Cobb and Bev Leigh approached her about taking Marbury's position as a mortgage loan officer. In fact, she was given the position of "loan counselor/processor" on February 18, 1986. (Plaintiff's Ex. 121). While she was not sure she was ready for the position, she took it and received a raise to $14,000. In this position, she did not supervise any other employee. Her primary function was to solicit loan business and take loan applications that were then passed on to the loan processors and closing staff. When she first took this position, she did not have a loan processor and had to do the processing of the loan application herself.

48. In September 1987, she and a number of other employees were converted to commissioned loan originators/solicitors. She no longer received a salary or retirement benefits and was paid entirely on a commission of 30 basis points (0.3% or a factor of 0.003) for each loan she originated. At the time, Marbury was being paid 50 basis points as a loan solicitor for AlaFed Mortgage,

26

a subsidiary of Alabama Federal.  Plaintiff Robertson resigned her
employment at Alabama Federal in 1988 and went to work for a
competitor bank.

49.  Plaintiff Mary Hill first went to work for Home Federal
in May 1968 as a teller.  Tom Woodman was the president at the
time.  She had a high school diploma, but no college.  In 1971, she
was promoted to head teller at the downtown office, and in 1974 she
became the insurance clerk, a job that required her to assure that
all property on which the bank held a mortgage had appropriate
insurance coverage and to place coverage if necessary.  In 1976,
plaintiff transferred to the loan servicing department where she
analyzed the escrow accounts of mortgage customers to make sure
that they were paying enough into the escrow to cover the insurance
and tax needs of the property.  Plaintiff knew little or nothing
about loan origination, processing, approval, or closing.

50.  In 1977, plaintiff Hill went to the loan department.
Other employees in the loan department at that time were Ronnie
Roberts, Jim Maples, Shirley Williams, and Gregg Scott and his
secretary.  Scott managed the department, Roberts and Maples were
loan officers who took loan applications, and plaintiff and Shirley
Williams (also a plaintiff) processed the loans.  Preparing the
loan for closing involved checking insurance, checking title, and
preparing HUD disclosure forms and other documents necessary to
close the loan.  Roberts and Maples closed the loans prepared by

27

plaintiff.  By 1982, she was doing closings, along with Roberts, as well as preparing the paperwork for closing.  Because she felt underpaid and "stressed out," she resigned her employment at Alabama Federal.

51.   The chain of command in the Central Division loan department in May 1982 consisted of Gregg Scott, as Senior Vice President of the Loan Department, having overall supervision, with Jim Maples immediately below him as Vice President of Loans. Ronnie Roberts held the position of mortgage origination manager. Under Maples' supervision were the loan processing and servicing staff, including plaintiff Shirley Williams.  Other employees were Connie Foster and JoAnne (last name unknown).  Roberts worked originating loans, both in the office and out, meeting with realtors and builders.  He also worked in loan servicing, calling on delinquent mortgage accounts and occasionally foreclosing loans.

52.   Plaintiff Shirley Williams was hired by Home Federal Savings and Loan Association in August 1976 as a loan processor. She had a high school education, one year of college, and an associate degree from a business college.  The job of loan processor was a clerical job that entailed collecting data on loan applications, such as employment verification, credit histories, and financial statements of the borrower, to be presented to the loan approval committee for its use in determining whether to approve the loan.  In November 1978, plaintiff Williams moved to

28

the loan servicing department, which meant analyzing escrow accounts to assure that taxes and insurance on mortgaged property were collected and paid on schedule. Plaintiff remained in this position throughout the rest of her employment with Home Federal and, later, Alabama Federal. She was terminated in 1985.

53.   When hired, plaintiff Williams' supervisor was Jim Maples, who also trained her. She had no training and little or no knowledge concerning loan origination or closing.

54.   Plaintiff Betty Putman was hired by Alabama Federal on December 27, 1982, initially as Gregg Scott's administrative assistant. She was given the title of closing secretary. She had more than twenty years' experience in mortgage lending, having been an assistant vice president of lending at two competitor savings and loan associations, and she made clear that she expected to progress to a similar position with similar pay. She was recruited by Scott because of her knowledge of FHA/VA loans, which Alabama Federal was attempting to introduce into its mortgage loan products. Gradually, by the summer of 1983, Putman took over responsibility for closing loans.  It is important to note that, as a loan closer, plaintiff Putman acted in more of a clerical capacity.  The note and mortgage were prepared by a law firm, Pritchard, McCall, and Jones. She was not responsible for checking title, because a title insurance policy was obtained from a title company. She did prepare the HUD-1 disclosures and was responsible

29

for disbursing the proceeds of the closing. Nonetheless, her duties were not comparable to those one might expect to be performed by an attorney at closing.

55. Plaintiff Hill returned to Alabama Federal on June 20, 1983, as the "loan servicing/closing and tax clerk," doing loan closing preparation, which involved preparing and typing the papers and forms necessary to close the loan. She worked primarily with Betty Putman, who did most of the loan closings. Whenever she did not understand a closing paper or had other problems with preparing for closings, she checked with Jim Maples or Ronnie Roberts. According to Putman, plaintiff Hill never exhibited any interest in advancement, although she had broad knowledge in loan processing and servicing. Hill's job was clerical in nature. Plaintiff Hill resigned again in September 1984.

56. In July 1983, Gregg Scott moved out of the loan department to take over the bank's real estate development arm, AlaFed Realty. With that, Maples was promoted to Senior Vice President over the Central Division loan department, but he resigned on December 31, 1983. On January 24, 1984, Ronnie Roberts was promoted to Vice President of Mortgage Loans in the Central Division to replace Maples. Maples was first employed at Home Federal in 1972, after graduating from college with a degree in marketing. In 1974, he was promoted to manager of mortgage servicing, then to assistant vice president in the loan department,

which involved more and broader loan functions than simply servicing. By the late 1970s, he was Vice President of Loans, second in authority behind Gregg Scott in the operation of Home Federal's loan department.

57. Plaintiff Putman made clear her dissatisfaction with her position and pay. In the summer of 1983, just before Scott left to go to AlaFed Realty, Putman approached him about upgrading her position and pay. Scott succeeded in getting her a raise from $13,200 to $15,200 and in getting her title adjusted to "loan processor/closer." The court finds that Scott did not promise Putman that she would be given a title and pay comparable to that she had at her previous job because such a promise would have been so clearly beyond Scott's authority to give.

58. In late 1983 or early 1984, the regional president of the Central Division, Winston Porter, placed Putman and several other loan department employees on a commission or incentive-bonus program for calendar year 1984. Plaintiff was to receive her base pay of $15,800, plus 5 basis points (0.05% or a factor of 0.0005) on each loan she closed, up to a maximum pay of $35,000 for the year, regardless of who originated the loan. Several mortgage originators, including Tom Macon, Ronny Hudspeth, Ronnie Roberts, Rick Redmon, and Steve Watkins, also received basis point commissions on the mortgages they originated. Their basis points varied from 10 to 35 basis points (0.35% or a factor of 0.0035),

31

depending upon the nature of the loan, but each originator received a commission only on those loans he originated.   Hudspeth was the Center Point branch manager and branch supervisor at the beginning of the year, but by mid-year was promoted to executive vice president for the central region after Winston Porter left.   Macon was the Wetumpka branch manager and a vice president with an additional office in Montgomery under his responsibility.   In January 1984, Roberts was promoted to Vice President of Mortgage Loans, replacing Jim Maples who resigned at the end of 1983. Watkins was hired as a loan originator in February 1984 and paid exclusively by commission.   Likewise, Redmon was hired as a loan originator in April 1984 and paid exclusively by commission, but he resigned in September 1984.

59.   For 1984, plaintiff Putman received a total gross income of about $30,500, composed of her base pay and about $14,700 in basis-points bonus.   For the year 1984, the following commissions or incentive bonuses were paid under the mortgage loan commission/bonus plan to other employees:

| Name | Total Paid Commission | 1984 W-2 pay |
|------|----------------------|--------------|
| Ronny Hudspeth | $5,230.93 | $38,436.23 |
| Tom Macon | $45,473.80 | $ unknown |
| Rick Redmon | $16,653.75 | $ unknown |
| Ronnie Roberts | $35,278.28 | $ unknown |
| Steve Watkins | $36,323.73 | $35,917.77 |

Although Roberts, Hudspeth, and Macon each also had a base pay, it appears that their total pay, the combination of base pay and incentive bonus, were capped at various levels, like Putman's.

60.   At the close of 1984, Alabama Federal CEO James Gambill announced that the incentive bonus plan was being terminated.  This upset Putman, who spoke to both Hudspeth and Gambill about increasing her pay due to the loss of the incentive bonus.   In February 1985, it was agreed that she would be raised to $19,000 per year, but Putman remained upset because the raise was not made retroactive to the first of the year, and she requested a transfer to another job within the bank.

61.   In March 1985, she asked Hudspeth to perform an evaluation of her because she had not had one since Scott did one in July 1983.   In a memo dated March 11, 1985, (Defendant's Ex. 567), her position was described as "Loan Processor/Closer for the Central Region," subject to the supervision of Ronnie Roberts as "Vice-President in charge of Real Estate Lending for the Central Region."   Attached to the memo was a copy of an October 1983 job description for "Loan Processor/Closer."  She resigned in September 1985 to take another job.

62.   During Putman's employment many changes in the management of the loan department occurred.  On May 16, 1983, Ronnie Roberts was given a promotion to assistant vice president of loan origination, expressly due to his "outstanding" service.   (See

33

Defendant's Ex. 546).   In a memorandum of promotion, Roberts' supervisors wrote, "Promotion to assistant vice president resulting in additional responsibilities and supervisory authority over several employees.  Quality of work and quantity of work has been outstanding."  Roberts received a $2,000 per year raise with the promotion, taking his pay to $18,721.04.  In July 1983, Gregg Scott left the department (and the bank) to take over AlaFed Realty.  Jim Maples was promoted from Vice President of Mortgage Loans to Senior Vice President of Mortgage Loans to replace Scott and run the Central Division loan department, including all aspects of it from loan origination to processing, closing, and servicing. Additionally, in November 1983, Maples was tapped by Tom Wicks to lead a team or committee in an effort to create uniform standards and practices for loan servicing and escrow analysis among the four divisions, and particularly to move the four divisions toward the same computer system for loan servicing.  Just a month later, on December 31, 1983, Maples resigned unexpectedly.  On January 24, 1984, Roberts was promoted to Vice President of Mortgage Loans for the Central Division, replacing Maples and assuming all of the duties Scott and Maples had held before him.  His supervisory duties increased greatly, being given hiring and firing authority and supervision of out-of-town loan originators Rick Redmon, Steve Watkins, and David Outland as they were hired in 1984.  His supervision of the loan department encompassed both Birmingham and

Montgomery.    None  of  these  promotions  was  posted  or  otherwise announced  a  vacancy.    It  was  announced  who  had  been  promoted  to each  position  after  the  position  was  filled.    Promoted  at  the  same time  as  Roberts  on  January  24,  1984,  were  another  man,  Tom  Macon, and  two  women,  plaintiff  Merredith  Moody  Smith  and  Gail  Norris. (See Defendant's Ex. 570).

63.    During  this  same  1983-1988  time-frame,  Alabama  Federal was  struggling  to  unify  and  centralize  its  banking  functions, including  loan  servicing,  checking  accounts,  personnel,  computer functions,  and  accounting.    Prior  to  the  1982  merger,  each  of  the four  predecessor  associations  had  separate  computer  systems  and record-keeping  protocols;  separate  mortgage  lending  operations; separate  procedures  for  analyzing  escrow  accounts,  maintaining records,  and  servicing  loans;  different  personnel  practices;  and, separate  checking  account  services  and  procedures.    Following  the merger,  efforts  were  directed  to  make  these  procedures  and practices  uniform  as  a  preliminary  step  toward  unifying  them  into a  centralized  operation.    This  did  not  always  go  smoothly,  causing discord  throughout  the  new  entity,  from  the  Board  of  Directors  on down.

64.    One  of  the  first  of  these  efforts  was  to  merge  the accounting  functions  of  the  four  predecessor  institutions.    Soon after  the  1982  merger,  a  decision  was  made  to  merge  all  accounting functions  in  Tuscaloosa  under  Jack  Sullivan.    This  decision  made

the employees of the accounting department of the old Home Federal in Birmingham redundant, and efforts were made to shift them to new assignments in order to save their jobs.   One of these was Joe McArthur, who was transferred from his job as treasurer in the old Home Federal accounting department to the new position of Vice President/NOW Accounts, which was a corporate officer position in the new Alabama Federal structure.   That transfer occurred in May or June 1982, and involved coordinating the consolidated checking account operations of all four predecessor institutions.   He remained in that position until he resigned, effective August 22, 1983.

65.   Following McArthur's resignation, Central Regional president Winston Porter offered McArthur's job duties over checking accounts (but not the title or pay) to plaintiff Joan Lacy.   She accepted, and in August 1983 was made the "checking accounts supervisor."   At the same time, certain of McArthur's former duties relating to the Automated Clearing House (ACH) were split off and placed under the supervision of Melanie Motes. Plaintiff Lacy remained the checking accounts supervisor until she was reassigned to the accounting department in February 1985, due to dissatisfaction with her performance.   She resigned her employment entirely in September 1985.

66.   Lacy was first employed by Home Federal Savings and Loan Association in August 1963.   She was 17 years old and had just

graduated from high school and had no college education. She was employed as a teller for a few years until she was promoted to the accounting department, then under the supervision of David Spurlock. In the early 1970s, Spurlock was replaced by Sam Koone, the vice president over accounting. She never took any professional development courses from the Institute of Financial Education. During her tenure in the accounting department, she was involved in many aspects of accounting, including preparing monthly reports to the Federal Home Loan Bank Board, account reconciliation between the main office and local branches, handling insurance and reimbursement expenses, auditing branch office books, assisting with external audits of the bank, assisting branch managers with preparation of their budgets, and coordinating the transfer of operating funds between the Federal Reserve Bank and Home Federal's branch offices. Although she did not attend meetings of the Board of Directors, she helped prepare the monthly financial statements for the meetings. In 1977, she was given the title of assistant secretary, a corporate officer of Home Federal. During this time before the merger, she reported to Sam Koone and worked on many projects with Joe McArthur.

67. After the April 1982 merger, McArthur left the accounting department. Lacy then began assisting Koone with investment of the bank's funds. She would call various banks to obtain information on the treasury-bill rates. Based on that information, Koone would

instruct her on where and how to invest the bank's excess funds and she would carry out those instructions. When Koone resigned in December 1982, just eight months after the merger, investment decisions were moved to Tuscaloosa and plaintiff Lacy was no longer involved in them on a daily basis.

68. Joe McArthur was first employed as a bookkeeper in the accounting department of Home Federal in May 1974. He had just graduated from college with a degree in accounting. By December 1974, he was made head bookkeeper/general accounting supervisor. By 1976, he had completed numerous courses of study with the Institute of Financial Education and had earned a diploma from it. (Defendant's Ex. 476). In 1976, he was promoted to controller. In 1978, he was promoted again to treasurer and controller, which was a corporate officer's position. As such, he prepared the institution's budget and financial statements and supervised audits at the branch offices. McArthur was responsible for investing the association's excess funds, involving between $5 and $15 million dollars daily. When savings and loan associations were allowed to start offering checking account services in the late 1970s, McArthur was given the responsibility for running Home Federal's checking accounts, in addition to his other accounting duties. These checking account duties consumed about 25% of his time. Prior to the merger, McArthur was involved extensively in planning

for the consolidation of the accounting functions of the four associations.

69.   When the merger occurred in 1982 and the accounting functions of the four predecessor associations were consolidated in Tuscaloosa, McArthur's job became redundant, but he was given the new title of Vice President/NOW Accounts and assigned the responsibility of consolidating the checking-account operations of the four merged entities.   As a vice president, he was also a corporate officer of the newly created Alabama Federal and paid $27,000 per year.   This job entailed collating bank statements to checking account customers, capturing checks, and coordinating the clearing of checks through the Federal Reserve and Alabama Federal's clearing bank, Central Bank of the South.   He supervised receiving the checks from the Federal Reserve, sending them to the checking bureau, matching statements with canceled checks, and mailing the statements to the customer.   It required him, four times a month, to pick up from the bus station heavy trays of bank statements prepared by Florida Information Systems (FIS) and shipped to Alabama Federal, which were taken to Central Bank for processing.   He used a company car to transport the statements. Because the checking functions of all four predecessor banks were consolidated, he was responsible for about 10,000 checking accounts, which was still less than most commercial banks were handling.   McArthur also ran the bank's Automated Clearinghouse

39

(ACH), which allowed the debiting or crediting of checking accounts electronically, such as direct deposits into customers' accounts from government sources and automatic draft mortgage payments.

70.   When McArthur submitted his letter of resignation on August 2, 1983, Ronny Hudspeth recommended to Central Division president Winston Porter that plaintiff Lacy be given the opportunity to take over checking account supervision.   Plaintiff Lacy had no prior experience supervising the checking account functions of the bank, but Alabama Federal was losing money at the time and looking for ways to cut expenses.   Rather than hire someone with checking account experience at a commercial bank, the decision was made to offer the job to plaintiff Lacy, whose job in accounting was disappearing due to the consolidation.   McArthur remained with the bank for three weeks, until August 22, 1983, training plaintiff Lacy.   He was concerned about her ability to lift the heavy bank-statement trays, but believed she could arrange for help with other bank employees.   The ACH previously supervised by McArthur, however, was assigned to Melanie Motes, not plaintiff Lacy.   Plaintiff Lacy was not made a corporate officer, but was given the title of "checking account supervisor" and given a $25 to $50 per week raise to $18,360 per year.   She used her own car to pick up check drops at the bus station, not a company car.

71.   Plaintiff Lacy began to experience health problems.   She missed approximately 60 days of work from June to August 1982 for

40

a hysterectomy.  Then, after taking over the checking account supervision, she suffered from stress and exhaustion, causing her doctor to advise her to take off November and December 1983.  By November 1984, the checking account reconciliation between Alabama Federal and its clearing bank was four or five months behind.  When Rod Schlosser was hired as controller in November 1984, he spent the first four months of his employment bringing the reconciliation up to date.  In February 1985, plaintiff Lacy was reassigned by Ronny Hudspeth to the accounting department under Schlosser's supervision in what was effectively a demotion.  In September 1985, she resigned.  At some point after Lacy's removal as NOW Accounts supervisor, Melanie Motes, the ACH supervisor, was given responsibility over NOW accounts in addition to her ACH duties.

72.  Another consolidation effort involved making mortgage loan servicing uniform.  This involved developing a standard protocol for escrow analysis and loan servicing.  Prior to the merger, each of the four predecessor associations had its own unique system and, in particular, separate people heading up the loan servicing function.  In 1984, Ken Reynolds, the branch manager of the Quad-Cities branches, was given the assignment by Jack Shannon, the new chairman of the board, to locate appropriate space in Birmingham in which to house Alabama Federal's corporate headquarters.  The plan was to move the corporate headquarters from Tuscaloosa to Birmingham and to consolidate certain company-wide

41

functions such as accounting, data processing, and loan servicing. In 1985, after he completed locating and renovating a building for the corporate headquarters, Reynolds was offered the position of Vice President/Loan Servicing and the task of establishing a consolidated operation for escrow analysis and servicing for all mortgage loans company-wide, regardless of which division originated the loan. This was an entirely new position in which Reynolds was tasked with hiring staff and developing procedures for accomplishing the consolidation of loan servicing company-wide. To assist him, he contacted plaintiff Gail Figg, who agreed to come to Birmingham as his assistant with the title "loan service coordinator."

73.   Gail Figg was first hired by Security Federal in September 1975 as a teller/savings counselor. Within six months, she became secretary to the president, Buddy Petty, a position she retained until 1984. In 1977, she approached Petty about organizing a loan servicing department for Security Federal, where loan servicing was being handled in a haphazard way. He agreed and she immediately undertook the task, while still working as his secretary, of establishing a standard protocol with all loan servicing being done at the main office. Eventually, she was given the title of "loan servicing coordinator" and, in late 1980, the title "assistant secretary," although not a corporate officer.

74. Following the 1982 merger, efforts got underway to make the varying loan servicing practices of the predecessor entities more uniform. Plaintiff Figg was given the task of coordinating the Northern Division with the comparable loan servicing coordinators from the three other regions or divisions of Alabama Federal, one of whom was Jim Maples, then Vice President of Loans in the Central Division. She received a raise to $15,000 per year. The principal task faced by the four-person committee was a computer conversion of the four separate computer systems used by the predecessor entities for escrow analysis and servicing. Because several of the predecessor associations used FIS for escrow, the decision was made to convert all systems to FIS. Preliminary to that was the need to develop a standard protocol for entry of loan and escrow information into the computer systems. Plaintiff Figg was active in attempting to develop that standardization. While plaintiff Figg represented the Northern Division on the four-person, loan-servicing committee in 1983, she was not placed in charge of that effort statewide; her role as member of the committee was no more important than that of the other members.

75. In November 1983, Bill Warren left the Northern Division of Alabama Federal, and plaintiff Figg was made Regional Operations Officer for the Northern Division, in addition to her duties as loan servicing officer. She received a raise to $16,200.

Comparable operations officers in other regions were Ronny Husdpeth (whose 1984 salary was $32,280) in the Central Division, Twynette Ellis in the Southern Division, and Hal "Buzz" Fowler (whose 1984 salary was $31,100) in the Western Division.   She held this position until January 1985, when she moved to Birmingham to assume the position of Reynolds' assistant.    There is no evidence concerning Twynette Ellis's rate of pay in 1984.

76.  Also in November 1983, plaintiff Figg was notified in a memorandum from Tom Wicks, a senior vice president who was directing the loan-servicing centralization project, that Jim Maples had been given the responsibility of leading the effort to unify and centralize loan servicing for the entire association.  At some point, Maples told plaintiff Figg that he was given the job because he was in Birmingham already and could coordinate with the computer company providing data processing.  Less than two months later, however, Maples resigned his employment on December 31, 1983, to take a job elsewhere.

77.  In March 1984, plaintiff Figg received a copy of another memorandum from Tom Wicks, addressed to the four regional managers or presidents, Winston Porter, Ernest Todd, Buddy Petty, and Owen Skinner, advising that B.G. Hines had been given the task of "initial planning toward centralized loan servicing."  The memo was dated March 5, 1984.  At the time, Hines was an operations auditor working out of the Western Division in Tuscaloosa.  This initial

44

planning was nothing more than a special research project assigned to Hines. It did not involve a promotion in title or rank or a pay raise; it was simply a research project assigned to him by Wicks. Hines was tasked with visiting the various branches of the bank and other mortgage companies to survey how loan servicing and escrow analysis was done. His project was simply to gather ideas concerning how centralized loan servicing could be accomplished. He was not given the specific job of implementing the centralization, nor was he ever given the position of Vice President-Loan Servicing. Upon completing the project, Hines left the bank at the end of June 1984.

78. It was in late 1984, perhaps September or October, that plaintiff Figg learned that Ken Reynolds had been given the job of Vice President-Loan Servicing and charged with the task of creating a centralized loan servicing department for the entire savings and loan association. There had been no notice or posting of the availability of the job, nor was she aware the vacancy existed. He called her to ask for her input and to ask her to move to Birmingham to assist him with the job of setting up the loan servicing department. She stated bluntly to Reynolds that she wanted **his** job, but she agreed to become his assistant in January 1985. She was given the title "loan services coordinator" and raised in pay to $22,000 per year.

45

79.   Plaintiff Figg worked as Reynolds' assistant in the Loan Servicing Department supervising approximately 25 to 28 employees. While Reynolds was the vice president responsible for the department, plaintiff Figg did most of the day-to-day management. Employees in the department were to report to her, and she in turn to Reynolds.

80.   In late 1986, Reynolds was removed from the position of Vice President-Loan Servicing by Rod Schlosser, the Vice President of Finance, in consultation with Skipper Goodwin, who, by then, had replaced Jim Gambill as CEO of Alabama Federal.  Gambill resigned as CEO on September 24, 1986.  (Defendant's Ex. 585).  Goodwin and Schlosser felt the loan servicing centralization was not going well and that the Loan Servicing Department was "in disarray."  They concluded that Reynolds had lost the respect of his employees and could not manage the department effectively, so he was moved to the position of Vice President-Property Management, responsible for managing the bank's rental property.  After being informed of his removal, Reynolds told plaintiff Figg and said to her that, if she ever wanted to be the Vice President of Loan Servicing, she needed to express it immediately to Schlosser.  Plaintiff Figg did so, going immediately to meet with Schlosser to express her interest in the position.  Schlosser told her that the job was being given to Buzz Fowler and that she would not be considered for it due to her close association with Reynolds.  He told her that, although she

46

was the most "technically sound" person in the Loan Servicing Department, the department needed supervision and closer management than Reynolds and she had provided.   Fowler had never worked in lending, always managing on the operations side of the savings and loan industry, but Schlosser expressed confidence in his management and supervisory skills.  A few months thereafter, on April 8, 1987, she resigned her employment.   Her rate of pay at the time was $25,000 per year.

81.   The creation of Alabama Federal also led to the creation of a centralized Personnel or Human Resources (HR) Department at the corporate level.   As with many other functions, personnel practices and policies varied significantly among the four predecessor entities.   Rates of pay varied significantly between divisions due to the continuing effects of the practices of those entities pre-dating the merger.   Generally, pay was lower in the Northern (old Security Federal) Region.   After the merger, it was important to bring these more closely in line to eliminate the perceived unfairness caused by the differences.   One step in that process was a centralization of personnel matters in a corporate HR department.

82.   Plaintiff Jean Bryant Piersol was hired by CEO Jim Gambill in February 1985 to set up a centralized HR department for Alabama Federal.  Her pay was set at $35,000 per year.  At the time of her hiring, plaintiff Piersol had about five years of experience

in personnel and human resources management.   Although she had worked for City National Bank for a number of years, she first entered the HR field around 1980 when City National sent her to several schools for HR training.   She attended programs at the University of Alabama (about two weeks), the University of Maryland (about three weeks), and the University of Colorado.   She received a certificate of training in HR, but had no college degree in HR or any other field.   Upon completion of this training, plaintiff Piersol was made the HR director for City National Bank.   In 1984, Colonial Bank acquired City National Bank and moved the HR department to Montgomery.   She was offered the position of human resources officer in Montgomery, but declined to move.   Thereafter, plaintiff Piersol worked at Parisian as an HR manager for about six months, mainly conducting interviews and screening applicants for employment.

83.   In February 1985, plaintiff Piersol was hired at Alabama Federal as Vice President and Director of Human Resources at the corporate main office in Birmingham.   Initially, she had no staff in the HR department and shared a secretary with CEO Gambill and Chairman of the Board Jack Shannon.   In August 1985, Cathy Gettys was hired as a "personnel assistant."   Gettys had just graduated from the University of Alabama with a bachelor's degree in human resources.   Jerrie Bell also handled some personnel matters in the Western Division in Tuscaloosa.

84.   During her tenure at Alabama Federal, plaintiff Piersol undertook several projects, such as writing a uniform personnel manual for all divisions, writing job descriptions for all positions in Alabama Federal, and conducting a salary survey to set uniform rates of pay both within Alabama Federal and as compared to the larger employment market.  It was plaintiff Piersol who wrote the job descriptions for branch managers I, II, and III, based on the employment practices at the time.  She also was involved in screening, interviewing, and hiring all clerical staff, and in recruiting candidates for upper-level management positions.  She made recommendations concerning promotions.

85.   At some point during her tenure, plaintiff Piersol was instructed by CEO Gambill to find some basis for dismissing Linda Jo McConnell.  He described her as a "country bumpkin," who did not fit into his plans for the organization.  Plaintiff Piersol traveled to Huntsville, met with McConnell, and reported to Gambill that she was a good employee and that there was no basis for firing her.

86.   Plaintiff Piersol's compensation and benefits did not include a company car or paid membership in social or civic organizations.  Some bank employees, both male and female (Brenda Holliman and Cindy Cheatham), did have the use of a company car, and some, upper-level management personnel had paid country club memberships.  CEO Gambill, Regional Manager Skipper Goodwin, and

Vice President of Commercial Real Estate Lending Whit Walter all had paid club memberships. Whit Walter was hired in May 1985 at a pay of $53,000 annually. He had been employed in the mortgage lending business since 1967.

87. Plaintiff's employment was terminated in January 1986. Late on a Friday afternoon, CEO Gambill came to her office and informed her that she was being dismissed and that she should remove all her personal belongings that evening. She asked for an explanation, but Gambill replied that he did not have to give her one. She then replied that Jack Phillips had better not be sitting at her desk the following Monday morning.

88. Upon plaintiff's termination, Cathy Gettys was promoted to personnel coordinator and took over plaintiff's HR responsibilities. In early 1987, Gettys was promoted to Assistant Vice President of Human Resources.

89. At the end of 1987, Alabama Federal acquired several savings and loan associations from Louisiana, which doubled the size of Alabama Federal's employee workforce. In April 1988, Gettys recommended to her supervisor, Mac McCollough, that the bank needed to hire someone with greater HR experience to head the HR Department. McCollough discussed this with the new CEO, Skipper Goodwin, who agreed and directed Gettys to begin recruiting someone to fill the position. She contacted Jack Phillips, then the head of the HR department at Vulcan Materials, simply to see if he could

50

give her names of people who may be interested.   Ultimately,
Phillips expressed interest himself, submitted his resume, was
interviewed by Skipper Goodwin, and was hired in May 1988 as
Executive Vice President of Human Resources.   He was paid $60,000
per year, plus stock options.

90.   At the time he was hired, Phillips held a college degree
in physics and engineering, plus a masters degree in decision
sciences and a Ph.D. in human resources.   He had written three
books and over 30 articles in the HR field.   He had worked for
several years as the head of HR for Vulcan Materials, a large,
multi-state employer with numerous locations, and had over 20 years
experience in human resources.   He had taught human resources at
the college level at Samford University, the University of Alabama
at Birmingham, and Birmingham-Southern College.   Indeed, he had
taught a course taken by plaintiff Piersol.   Upon leaving Vulcan
Materials, Phillips was being paid over $100,000 per year, and he
negotiated his salary and stock options at Alabama Federal.

91.   Phillips was hired by Skipper Goodwin, who became the CEO
of Alabama Federal in September 1986, when Jim Gambill resigned.
Phillips did not know either Goodwin or Gambill prior to being
hired at Alabama Federal.

92.   Plaintiff Carol Manning Woodruff was hired as an office
stenographer and savings counselor by First Federal, later Heritage
Federal, in Tuscaloosa on June 15, 1972.   She had completed high

school in 1971 and a business education program at Shelton State Community College. While employed, she furthered her education with courses through the Institute of Financial Education. As an office stenographer, she transcribed dictation from eleven male employees. As a savings counselor, she assisted customers with opening accounts and certificates of deposit.

93. After two years, plaintiff Woodruff became the executive secretary to Heritage Federal's president, John Cade, and its chairman of the board, Clemson Duckworth. In that position, she performed general secretarial duties, such as typing correspondence, arranging meetings, calendaring and scheduling, and making travel arrangements for Cade and Duckworth. Occasionally she would assist customers in the savings area.

94. Owen Skinner, Jr., started at First Federal/Heritage Federal in May 1972 as a management trainee. He received a degree in marketing from the University of Alabama in 1970, and served almost two years on active duty in the army, before joining the bank. His immediate supervisor was Charles Compton, the marketing director for the bank. After a couple of years, Skinner became the assistant operations officer, then the operations officer in 1975 or 1976. As operations officer, he was directly responsible for all teller operations, opening new accounts, and collection of delinquent loans. He supervised all branches of First

Federal/Heritage Federal, including four to six branches in Tuscaloosa, plus branches in Butler and Livingston.

95. On July 1, 1977, Skinner was named the bank's corporate secretary and personnel director. Prior to his assuming these duties, the corporate secretary and personnel director had been Lola Stanforth. In this position, he was responsible for personnel administration, such as maintaining personnel records, updating personnel policies, assisting personnel with insurance and tax matters, hiring and firing recommendations, and preparing and filing governmental reports on employment. His corporate secretary duties included maintaining and attesting corporate documents and records, scheduling meetings of the board and its committees, and maintaining the minutes of the meetings of the board and its committees. On January 11, 1979, he was promoted to the position of vice president/corporate secretary, but his essential job duties did not change. He resigned on April 7, 1980, to take another job. He was being paid $22,800 per year at the time.

96. Although still employed as the executive secretary or administrative assistant to the president, John Cade, plaintiff Woodruff also assisted Owen Skinner with his duties, both as personnel director and corporate secretary. Under his direction, she would prepare and maintain personnel insurance, payroll, and tax records, prepare reports to the board and to governmental agencies, and assist personnel with filing insurance claims. She

also typed the minutes of board meetings and prepared the "directors' books," three-ring binders with all reports, agenda items, and other records necessary for each meeting of the board. She did not, however, attend the meetings.

97.   When Skinner left Heritage Federal in April 1980, plaintiff was given all of his duties, both in personnel administration and as corporate secretary, while still working as Cade's executive secretary. She was given the title of assistant corporate secretary and, for the first time, began to attend the meetings of the board of directors to keep the minutes. After about a year and half, she was promoted to corporate secretary on November 11, 1981, and given a raise to $13,500 per year. Her essential duties in personnel administration and as board secretary did not change. In anticipation of the merger, plaintiff Woodruff worked closely with the "conversion team," consisting of the four presidents of the associations to be merged, Cade, Porter, Petty, and Todd.

98.   With the merger that created Alabama Federal on April 1, 1982, a re-shuffling of titles and positions occurred to attempt to accommodate all of the officers of the predecessor entities. Ernest Todd, the president of the old Home Savings in Mobile, was made the corporate secretary of the new Alabama Federal. Plaintiff Woodruff was made the assistant corporate secretary of Alabama Federal, although she continued to perform the essential duties of

the corporate secretary with respect to the board of directors. She also continued to work as Cade's administrative assistant and to perform personnel administration for the Western Division. Cade became the president and CEO of the newly-created Alabama Federal due to the fact that Heritage Federal was the largest and most dominant of the predecessor associations.

99.    In June 1983, plaintiff Woodruff was elected to be the corporate secretary for Alabama Federal. In addition to attending the meetings of the corporate board, she also was required to attend and maintain the minutes of the meetings of subsidiary boards and divisional boards. Because she already was performing personnel administration, she was officially named the Western Division personnel officer on July 5, 1983. Again, her duties in personnel administration remained essentially unchanged from what they had been since Skinner had left in 1980.

100.    Soon after the 1982 merger, Alabama Federal began preparing to convert to a stock company from a mutual company. Throughout 1983, plaintiff Woodruff actively worked on a "conversion team" with other executives, gathering information to be printed in a stock-offering circular in February 1984. She was the main contact person through which members of the team coordinated their activities. In January 1984, Owen Skinner was hired by Alabama Federal to take a lead posture on the stock conversion. He, Cade, and plaintiff spent two to three weeks in

March 1983 traveling around the state to present the stock-offering circular in every city in which Alabama Federal had a presence.

101.   In April 1984, controversy over the stock offering developed among the directors and officers of Alabama Federal.   At a stormy board meeting, Cade was removed as president and CEO, along with a number of board members allied with him.   Jack Shannon became the Chairman of the Board and James Gambill became CEO, effectively ending the old Heritage/Tuscaloosa dominance of Alabama Federal.   Thereafter, the corporate headquarters was moved to Birmingham from Tuscaloosa.   (See paragraph 72, supra).

102.   Plaintiff's close association with Cade also caused her undoing.   On July 30, 1984, Shannon informed plaintiff that she was being terminated.   When she asked for a reason, he replied that he did not have to give her one.   He also refused her request for severance pay of one month for each year of service.   At the time of her termination, she was being paid $20,000 per year.

103.   Mike Woodall worked as Vice President of Consumer Lending in the Central Division in Birmingham from December 1985 to January 1987, making $24,000 per year.   He had six years of prior experience in consumer lending at a commercial bank before being hired at Alabama Federal.   Jerry Brooks also worked as Vice President of Consumer Lending in the Southern Division from January 1986 to March 1987, making $32,000 per year.   In these positions, Woodall and Brooks were peers of Rhonda Denton in the Western

Division and Darlene Brooks in the Northern Division, all heading their respective divisional consumer lending operations. <u>See</u> Defendants' Ex. 538.

## Conclusions of Law

1.   The parties agree that the relevant time period for assessing the claims of these plaintiffs began April 24, 1983, and ended for each of them at the respective times their employment with Alabama Federal ended.   That assessment of their individual claims is not merely a "Stage II" proceeding, following on the heels of the class settlement; rather, it involves the resolution of thirteen distinct claims of employment discrimination.   As such, each plaintiff must prove her claim by establishing a *prima facie* case under the <u>McDonnell Douglas</u> framework.   <u>See McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973); <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed. 2d 207 (1981); <u>see generally</u>, <u>Chapman v. AI Transport</u>, 229 F.3d 1012 (11th Cir. 2000)(*en banc*).   There is no direct evidence of discrimination on any of plaintiffs' claims.

2.   Under the <u>McDonnell Douglas</u> framework, the plaintiff is first required to set out a *prima facie* case of discrimination by a preponderance of the evidence.   The precise elements of the framework to be applied vary depending upon the nature of the alleged discrimination, that is, whether it related to failure to

hire, failure to promote, discipline, or compensation.  The two principle types of discrimination alleged in this action are discriminatory denial of promotion and wage discrimination.  "The plaintiff establishes a *prima facie* case of sex discrimination [with respect to pay] under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males."  Miranda v. B & B Cash Grocery Stores, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992).  The similarity of the jobs involves an assessment of the responsibilities required by them.  The Title VII standard is comparable to a claim under the Equal Pay Act, but more "relaxed" and not as rigid.  For example, a Title VII plaintiff is not required to show that she performed precisely the same job as her male comparator or that she works in the same facility as the male comparator.  Rather, "[i]n order to establish a prima-facie case of racial discrimination based on differences in salary, 'the plaintiff must show that he was paid less than a member of a different race was paid for work requiring **substantially the same responsibility**.'  Pittman v. Hattiesburg Municipal Separate School District, 644 F.2d 1071, 1074 (5th Cir. 1981)."[3]  Gibbons v. Auburn University at Montgomery, 108 F. Supp.

-----

[3] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the old Fifth Circuit Court of Appeals rendered before October 1, 1981.

2d 1311 (M.D. Ala. 2000)(bolding added).[4]  A plaintiff seeking to
demonstrate that similarly situated male employees were treated
differently must produce evidence that her comparators were
"similarly situated in all relevant respects." Holifield v. Reno,
115 F.3d 1555, 1562 (11th Cir. 1997)(citing Smith v. Stratus
Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994), cert. denied 514
U.S. 1108, 115 S. Ct. 1958, 131 L. Ed. 2d 850 (1995)).  Comparators
need not be a perfect match to the plaintiff; but plaintiff must
show that she and her comparators were sufficiently similar in
terms of seniority, rank, and job responsibilities to make a
comparison of their salaries meaningful for the purpose of
evaluating a wage discrimination claim.  Id.  Wage discrimination
under Title VII is not a guise for a "comparable worth" analysis.
The court may not analyze the claim on the basis that male and
female employees, although performing different work, have equal
worth to the employer and, thus, should be paid the same.  Under
Title VII, the plaintiff must prove purposeful discrimination and,
absent direct evidence of a discriminatory animus, the McDonnell-
Douglas framework provides a way of doing so with circumstantial
evidence.  Nonetheless, for a presumption of discrimination to
arise under that framework, the plaintiff must show that her work
involved substantially similar duties and responsibilities "in all

---

[4] Although Gibbons is a race discrimination case, the same
standard would apply to a sex-based wage discrimination claim.

relevant respects." Only by showing that substantial similarity between the jobs performed is it logically possible for a presumption to arise that the pay disparity is due to discrimination rather than some other legitimate business reason.

3.    "To establish a *prima facie* case of Title VII sex discrimination in a **promotional** decision, a plaintiff must prove: (1) that she is a member of a **protected minority**; (2) that she was **qualified** and **applied** for the promotion; (3) that she was **rejected** despite these qualifications; and (4) other equally or less qualified employees who are **not members of the protected minority were promoted.**" Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000)(citing Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999))(bolding added); see also, Alexander v. Fulton County, Georgia, 207 F.3d 1303 (11th Cir. 2000); Durley v. APAC, Inc., ___ F.3d ___, 2000 WL 1873461 (11th Cir., Dec. 26, 2000).

4.    Once the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for either, as the case may be, the female employee's lesser pay or her promotional rejection. See id.    Once a *prima facie* case of wage discrimination is established, the defendant must articulate a "legitimate, non-discriminatory reason for the pay disparity." Miranda v. B & B Cash Grocery Stores, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992) (citing Burdine, 450 U.S. at 255-56, 101 S. Ct. at 1095).

Likewise, on a claim of promotion discrimination, the employer must articulate a legitimate, non-discriminatory reason for the rejection of the female employee for the promotion. In both instances, this burden on the employer is "exceedingly light; the defendant must merely proffer non-gender based reasons, not prove them." Miranda v. B & B Cash Grocery Stores, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992)(quoting Perryman v. Johnson Prod., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983)). The articulation of the reason must be based on objective evidence, even if the reason itself is the subjective evaluation of the relative qualifications of the employees. See Chapman v. AI Transport, Inc., 229 F.3d 1012 (11th Cir. 2000)(en banc). Contrary to the argument advanced by plaintiffs, the articulation of the reason need not come from the actual decision-maker, so long as there is admissible evidence from which the inference can be drawn that such was the reason motivating the decision-maker. To accept plaintiffs' assertion that only the decision-maker can offer testimony or evidence to articulate the legitimate, non-discriminatory reason for the employment decision at issue is to conclude that, in cases in which the decision-maker is no longer available due to death or otherwise, the defendant employer is precluded from articulating its non-discriminatory explanation, even if there exists otherwise admissible evidence of it. The law requires only that the employer offer the articulated reason through admissible evidence from any

source, not just the decision-maker alone. Indeed, in <u>Bogle v.</u> <u>Orange County Board of County Commissioners</u>, 162 F.3d 653, 657 (11th Cir. 1998), the court of appeals recognized that the employer's articulated reason may come into the case even through evidence offered during the *plaintiff's* case-in-chief, such as a dismissal letter stating the reasons for the discharge.

5. If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual and that it actually was motivated by a discriminatory intent. Once such a justification is advanced, the plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent. In other words, the plaintiff must show that "a discriminatory reason more likely than not motivated [the employer] to pay her less." <u>Id</u>. (citing <u>Burdine</u>, 450 U.S. at 256, 101 S. Ct. at 1095). Such proof may be direct or circumstantial. The essential characteristic of a claim under Title VII is proof of purposeful, intentional discrimination. It remains the plaintiff's burden of showing, by direct or circumstantial evidence, that she was the victim of intentional discrimination due to her sex. <u>Lee</u> <u>v. GTE Florida, Inc.</u>, 226 F.3d 1249, 1253 (11th Cir. 2000); <u>Wright</u> <u>v. Southland Coporation</u>, 187 F.3d 1287 (11th Cir. 1999). It is not enough to show merely that the decision was unwise or bad business or that the plaintiff disagreed with its factual premise, or that

a wage disparity was due to oversight or other unintentional factors. Plaintiff must show that the stated reason was not the true reason, which, in fact, was illegal discrimination.

Branch Managers

6.    Four of the thirteen plaintiffs held the position of branch manager at one time or another after April 24, 1983, two at branches formerly part of Security Federal and two others at branches formerly part of Home Federal. Two of the branch managers, Dorothy Gurley and Nancy Martin, contend that they were discriminatorily denied promotions to loan officer, assistant vice president, and vice president due to their sex. All four branch managers also claim that they were discriminatorily denied pay comparable to that of male branch managers employed by Alabama Federal. Male employees identified by plaintiffs as comparators on their wage claims were Ronny Hudspeth, Mike Boyd, Ken Long, Carlos Pressnell, Jim Ross, John Adams, Percy Phillips, Jack Manning, Larry Mitchell, and Bev Leigh.[5]

7.    Plaintiffs Martin and Gurley contend that they were discriminatorily denied a promotion to the position consumer loan officer or vice president of consumer loans in the Northern Division, positions given to Percy Phillips. It is clear that

_____

[5]    See Document 500, the court's Order granting defendant's motion to strike certain comparators as having not been disclosed during discovery.

63

neither of these "promotions" occurred within the relevant time period after April 24, 1983. Phillips was hired as a consumer loan officer in 1978 and promoted only once to vice president of consumer loans in either 1980 or 1982. Because the particular employment decisions (whether the initial hiring of Phillips in 1978 or his promotion in 1980 or 1982) these plaintiffs challenge occurred outside the time-frame certified for presentation of class and opt-out claims, they cannot serve as a basis for recovery by them. Discriminatory denial of a promotion is not a continuing violation. Defendant is entitled to judgment on plaintiff Martin's and plaintiff Gurley's claims that they were discriminatorily denied promotion to a position held by Percy Phillips.

8. Insofar as either plaintiff Martin or plaintiff Gurley contend that they were discriminatorily denied promotion to a loan officer, assistant vice president, or vice president position held by Jack Manning, most of those promotional opportunities also were outside the relevant time-frame certified for class and opt-out claims. The only positions given to Manning after April 24, 1983, were executive vice president of the loan department (in 1983), assistant managing officer for the Northern Region (1984), and Vice President/Managing Officer in 1985. Plaintiffs were not qualified for any of these positions. The position of executive vice president of the loan department required extensive knowledge of consumer, mortgage, and construction lending, in none of which

did plaintiffs have much experience or training.  Plaintiffs had **no** experience or training in mortgage or construction lending. Although as branch managers, plaintiffs had taken consumer loan applications and appraised collateral offered to secure the loans, actual loan approval was given by Percy Phillips.  Plaintiffs had never exercised actual loan-approval authority.  Furthermore, the positions of assistant managing officer and vice president/managing officer were the number two and number one positions of authority in the Northern Region and involved extensive managerial experience with multiple branch offices and different types of lending.  These positions entailed management of the entire Northern Region.  As branch managers, plaintiffs had no experience with managing a large number of employees scattered in multiple branch offices. Plaintiffs' limited consumer loan experience and complete lack of mortgage lending experience left them unqualified for the positions held by Manning.  Because plaintiffs were not qualified for these positions, they have failed to make a *prima facie* showing of discriminatory denial of promotion with respect to them.

9.  Plaintiffs Nancy Martin, Dorothy Gurley, Merredith Moody Smith, and Sharon Waine McQueen also allege that they were not paid equally to several male branch managers.  Several of the alleged comparators relied upon by plaintiffs were not "similarly situated" to the plaintiffs and, therefore, comparisons to them fail to carry

the burden of establishing a *prima facie* case of wage discrimination.

10.  After April 24, 1983, Ronnie Hudspeth and Mike Boyd were branch supervisors, responsible for managing not only their respective branches, but also supervising the branch managers at several other branches as well.  Branch supervisors had more extensive duties and responsibilities than branch managers and, therefore, were not "similarly situated" to plaintiffs, who were responsible for managing only their separate branch offices.  Thus, plaintiffs cannot meaningfully compare their pay to that of Hudspeth and Boyd.  Thus, plaintiffs have failed to make a *prima facie* case of wage discrimination, at least with respect to Hudspeth and Boyd.

11.  Alleged comparators Phillips, Adams, Manning, and Leigh had substantially different job duties from the plaintiffs.  As mentioned, after April 1983, Phillips was the Northern Region vice president of consumer loans, responsible for deciding whether to approve or reject consumer loan applications and for overseeing the consumer loan operation generally.  Likewise, Adams was a loan officer in the Quad-Cities branches of Alabama Federal.  In this position, Adams solicited mortgage-loan applications through builders and realtors, originated mortgage loans, and supervised the loan processors in the Quad-Cities branches.  Plaintiffs Martin and Gurley **never** had consumer loan-approval authority, always being

required to submit the loan applications they received to Phillips for approval. Even though plaintiff Smith did exercise some consumer loan-approval authority before the 1982 merger, that changed soon afterward when Larry Harris and then Tom Allen became the consumer loan coordinator for the Central Region. Plaintiff McQueen acknowledged that all of her loan applications, consumer and mortgage, were approved by someone else. None of the plaintiff branch managers ever was involved in mortgage loan origination or processing during the relevant time period. Loan approvals were not the province of branch managers during the relevant time frame after April 24, 1983. Comparisons to employees like Phillips and Adams, who were responsible for loan solicitation and approvals, are not meaningful comparisons because they were not similarly situated to branch managers.

12. The same is true of comparisons to Manning and Leigh. As mentioned, by April 1983, Manning was executive vice president of the Northern Region loan department, responsible for general supervision of both consumer and mortgage lending in the Northern Region. Plainly, that job involved substantially different duties from those of branch managers, who had no lending responsibilities. Similarly, Bev Leigh was the head of the Western Region loan department in April 1983, a position on par with Manning in the Northern Region. For the same reasons Manning was not an appropriate comparator, so too the plaintiff branch managers cannot

meaningfully compare themselves to Leigh.  Thus, because the job duties performed by Manning and Leigh were not substantially similar to those of plaintiffs Martin, Gurley, Smith, and McQueen, they have failed to make a *prima facie* case of wage discrimination, at least in comparison to Phillips, Adams, Leigh, and Manning.

13.   No evidence at all was offered with respect to Larry Mitchell as a comparator.  Without some evidence showing that plaintiffs were sufficiently similar to him in terms of seniority, rank, and job responsibilities to make a comparison of their salaries meaningful, they have failed to establish a *prima facie* case of wage discrimination, at least with respect to Mitchell.

14.   The remaining comparators, Long, Ross, and Pressnell, while given the title of branch manager, like plaintiffs, were responsible for so-called "remote" or "out-of-town" branches, which entailed substantially more extensive duties and responsibilities. Ross was the Dothan branch manager, until he resigned and was succeeded by Long in 1985.  Pressnell was the manager of the Decatur branch until he resigned in early 1986.  A characteristic of these branches is that they were not located in one of the four major cities in which regional headquarters were located, Birmingham, Tuscaloosa, Huntsville, and Mobile.  Because they were "remote," in the sense of being geographically separated from a regional headquarters, these branches were given much more autonomy than branches located in the major cities.   "Remote" branches

68

originated, approved, and closed their own mortgage loans and consumer loans; they maintained their own mortgage loan files for servicing purposes, at least until 1985 or 1986, after these plaintiffs were no longer employed. "Remote" branch managers likewise exercised a greater degree of autonomy and independence, acting as the local "face" or representative of Alabama Federal within their respective communities. They were expected to originate and close more loan business than other branch managers and to be more active in civic and community affairs and organizations. A "remote" branch manager's job was not 9-to-5, like that of other branch managers, often requiring him (or her) to attend civic and social functions after hours as the representative of the bank. The fact that "remote" branch managers had greater responsibilities was recognized in 1985 when Alabama Federal adopted a formal job classification system: "remote" branch managers were classified as Branch Manager III, while "full-service" branch managers, like plaintiffs, were classed as Branch Manager II. Although there was overlap in the pay ranges for these two job classifications, the range for Branch Manager III was generally higher. Simply put, "remote" branch managers were not similarly situated to "full-service" branch managers because of their more extensive duties and authority. Thus, comparisons of plaintiffs Martin, Gurley, Smith, and McQueen to "remote" branch managers Ross, Long, and Pressnell fail to establish a *prima facie*

case of wage discrimination, and defendant is entitled to judgment on these claims by these four plaintiffs.

Central Division Mortgage Personnel

15.   Three plaintiffs, Mary Hill, Shirley Williams, and Betty Putman, were employed in the Central Division Loan Department, working exclusively with mortgage loans.   Although holding different positions within the Central Division Loan Department, all three assert claims for discriminatory denial of promotions. Additionally, Hill and Putman, but not Williams,[6] claim that they were discriminatorily denied pay equal to or comparable to male employees.

16.   Plaintiff Mary Hill alleges that she was denied a promotion to the positions of assistant vice president and vice president.   At the time Ronnie Roberts was promoted to assistant vice president of loan origination in May 1983, however, plaintiff was not employed at the bank, having resigned a year earlier. Although it is true that she was rehired to her job in the loan department on June 20, 1983, Roberts had already been promoted by then.   It cannot be said that Alabama Federal discriminatorily refused to promote her to this position because of her sex at a time she was not even employed with the bank.   Plaintiff Hill has failed to make a *prima facie* case on this claim because she has

_____

[6] See Pretrial Order, Doc. 462, pages 8-9.

failed to show that she either applied for the position or was even available for consideration for it.

17.   Insofar as plaintiff Hill complains that she should have received other promotions to assistant vice president and vice president, the only other promotions that occurred during her employment were Jim Maples' promotion to Senior Vice President of Mortgage Loans in July 1983 and Roberts' subsequent promotion to Vice President of Mortgage Loans to replace Maples in January 1984. On these, she has failed to show that she was qualified for either position.   This position, whether designated senior vice president or vice president, was the chief management job in the Central Division Loan Department.   Maples succeeded Gregg Scott, the head of the loan department, in July 1983, and was then succeeded by Roberts in January 1984.   At the time Maples was promoted to replace Scott, plaintiff Hill had been back on the job less than a month.  When Roberts succeeded Maples, she had been there less than six months.   In their turns, Maples and Roberts were required to manage the entire mortgage loan department, from loan origination to processing, closing, and servicing.  The job required not only extensive knowledge of all aspect of mortgage lending, but managerial experience as well.  While plaintiff Hill worked well as a loan processor, her job and her experience consisted mostly of clerical duties, not managerial duties.   Although she was knowledgeable in the area of loan processing, she had no experience

71

or training in loan origination, loan closing, or loan servicing. More importantly, she had no experience or training in the exercise of judgment relating to whether to approve or reject a loan application.   While both Maples and Roberts had served on the Central Division loan approval committee, plaintiff Hill had not. In short, plaintiff Hill was not qualified to be considered for promotion from a clerical job to the top management job in the Central Division loan department.  Because she has failed to show that she was qualified for the position, an essential element of a *prima facie* showing,[7] she has failed to make a *prima facie* case of discrimination for denial of promotion to head of the mortgage loan department.

18.  As reflected in the pretrial order, plaintiff Hill also complains that she was denied promotion to the positions of branch manager, loan officer, loan closer, and senior loan officer. Plaintiff's 1988 statement of claim, required by the opt-out procedures, did not state claims for denial of promotion to branch manager and loan closer; thus, these claims are not now before the court.  Further, other than the promotional claims discussed in the preceding paragraphs, plaintiff Hill offered no evidence that she sought and was denied the positions of loan officer or senior loan officer.   There is no evidence that there were any existing

_____

[7] <u>Lee v. GTE Florida, Inc.</u>, 226 F.3d 1249, 1253 (11th Cir. 2000).

vacancies in these positions, creating opportunities for promotion, or that other employees similarly situated to her were promoted to them.   Because there is no evidence that she was **denied**[8] a promotion to any of these positions, she has failed to make a *prima facie* showing of discrimination.

19.   For the same reasons, plaintiff Hill's claim of wage discrimination also fails.   Hill occupied a clerical position in the loan department, which cannot be compared meaningfully to the managerial positions held by Maples and Roberts.[9]   Hill never held

---

[8]   The court recognizes that a promotion claim does not necessarily hinge on whether a vacancy exists in a position to which a promotion is made in order to fill the position.  There can be instances where employees are promoted in title without necessarily filling a new position.  Nonetheless, to make a *prima facie* case of discrimination in promotion, the plaintiff must at least show that there was some opportunity for a promotion that she was denied because of her sex.  She must show that she applied for or sought a promotion or that similarly situated employees received promotions that she did not receive.  It makes no sense to say that an employer **intentionally denied** an employee a promotion due to her sex when the employee does not seek a promotion and there are no promotional opportunities made available to other employees.   A presumption of discrimination under the McDonnell-Douglas framework can arise only if there are circumstances to indicate that the employee had an opportunity to be promoted but was not.  As noted in Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000), the fourth element of a *prima facie* showing of promotional discrimination is that "other equally or less qualified employees who are not members of the protected minority **were promoted.**"  In the absence of such an opportunity, the employer has done nothing, denied nothing, and decided nothing from which discrimination can be inferred.

[9]   In the pretrial order, plaintiff Hill also identified Don Stroup as another wage comparator for proving her claim of wage discrimination.   On motion of the defendant, however, this comparator was stricken because plaintiff had not previously

a job that was similarly situated in rank, seniority, or job
responsibilities to the management jobs held by Maples (second in
command in the loan department and, then, first upon succeeding
Gregg Scott) and Roberts (the assistant vice president of loan
origination and, then, the head of the mortgage loan department
upon succeeding Maples). Because she was not similarly situated to
her alleged comparators, plaintiff Hill has failed to make a *prima
facie* showing of wage discrimination, at least with respect to
Maples and Roberts.

20. Plaintiff Williams also held a clerical position in the
loan department, working mostly in loan servicing, analyzing escrow
accounts to assure that taxes and insurance were collected and paid
on schedule. She claims that she was discriminatorily denied the
promotions that John Alexander and Ronnie Roberts received. Within
the April 1983 to 1985 time-frame, Alexander became the branch
manager of four Quad-Cities branches in the Fall of 1984. As
already mentioned, Ronnie Roberts was promoted to assistant vice
president of loan origination in May 1983 and then to vice
president of mortgage loans in January 1984. Plaintiff was not

identified him during discovery and his designation in the pretrial
order came as a surprise after the close of discovery. In any
event, no evidence was offered describing Stroup's position or his
job responsibilities. Without some evidence to show that he was
similarly situated in rank, seniority, and job responsibilities,
plaintiff has failed to make a *prima facie* case of wage
discrimination based on a comparison to Stroup.

qualified for any of these positions. The Roberts promotion in May 1983 to assistant vice president of loan origination was a "merit" promotion, intended not to fill a vacant position, but to reward Roberts specially for "outstanding" service to the bank.  In any event, plaintiff Hill had no training or experience in loan origination; she had no experience in dealing with realtors or builders to solicit and generate new mortgage-loan business.  Her position in loan servicing was entirely clerical, not managerial, so she had no training or experience in supervising other loan originators.  Likewise, she certainly was not qualified to be promoted to head of the loan department in place of Maples or Roberts.  The duties and responsibilities of that job were far more complex and difficult than her training and experience had prepared her for.  Also, she was not qualified for promotion to the position of Quad-Cities branch manager.  She had no training or experience as a branch manager or assistant branch manager, having worked only as a clerk in the loan servicing department.  She had never managed other people.  Indeed, she had never worked at all in operations or in branch offices, having spent her entire career on the lending side of the bank.  Alexander had been a branch manager in both Bessemer and Tuscaloosa.  Thus, plaintiff Williams also has failed to make a *prima facie* showing that she was discriminatorily denied promotion to any of these positions.

21.    Plaintiff Betty Putman asserts both promotional discrimination and wage discrimination claims. She contends that she was discriminatorily denied promotions to the positions of supervisor, loan officer, senior loan officer, assistant vice president and vice president.[10] Further, she contends that she was discriminatorily paid less than comparable male employees Ronnie Roberts, Tom Macon, and Bev Leigh.[11]

22. At the outset, there was no evidence offered to show that plaintiff was denied any promotional opportunities to the positions of supervisor, loan officer, or senior loan officer. There was no evidence of any vacancies in these positions, opening the

---

[10] In the pretrial order, plaintiff also asserted that she was denied promotion to the position of loan originator. Because she did not identify that claim in her 1988 statement of claim, required by the opt-out procedures, that claim is not now before the court. It simply was not asserted within the time deadline established for asserting claims under the opt-out procedures of the case.

[11] Plaintiff Putman also identified Gregg Scott as another wage comparator for proving her claim of wage discrimination. On motion of the defendant, however, this comparator was stricken because plaintiff had not previously identified him during discovery and his designation in the pretrial order came as a surprise after the close of discovery. In any event, it is clear that Scott was not similarly situated in rank, seniority, and job responsibilities to plaintiff Putman. He was the head of the Central Division loan department and the person who recruited and recommended her hiring as a loan closing secretary. His responsibilities were clearly broader and more complex than hers, his rank higher in the organization, and his seniority much longer. Because he was not similarly situated in rank, seniority, and job responsibilities to plaintiff, she has failed to make a *prima facie* case of wage discrimination based on a comparison to Scott.

opportunity for promotion, or that anyone else was promoted to them during her employment from December 1982 to September 1985. Plaintiff was hired by Scott as a loan closing secretary, but by July 1983, she was given the title loan processor/closer and given a $2,000 per year raise. Although she did express to Scott her belief that she had been promised when hired that she would be given the title and pay of an assistant vice president, she said nothing about seeking a supervisor, loan officer, or senior loan officer position. Absent some evidence that she sought or had the opportunity to seek such a promotion, plaintiff has failed to show a *prima facie* case of discriminatory denial of a promotional opportunity.

23.  As already mentioned, Ronnie Roberts was promoted to assistant vice president of loan origination in May 1983 and then to vice president of mortgage loans in January 1984.  Plaintiff contends she was discriminatorily denied one or both of these promotional opportunities.[12]

24.  Plaintiff Putman has established a *prima facie* case of promotional discrimination with respect to the promotion of Ronnie Roberts to assistant vice president of loan originations.

---

[12]  To be clear, the court concludes that plaintiff Putman is **not** asserting a claim that she was discriminatorily denied a promotion at the time Jim Maples was promoted from vice president of mortgage loans to senior vice president.  Neither her statement of claim nor the pretrial order identifies any claim to a position as "senior vice president."

Plaintiff is a member of the protected female class. She was qualified for the position based on her more than twenty years of loan origination and processing experience at other savings and loan associations before her employment with Alabama Federal. Although she did not apply for the position, she was prevented from doing so because the possibility of promotion to that position was not posted or otherwise made known to interested employees. She was rejected for the promotion, at least in the sense that she did not receive it, and it was given to a male employee with equal or lesser qualifications for it. Having established a *prima facie* showing, the burden of articulating with admissible evidence a legitimate, non-discriminatory reason for the promotion of Roberts over plaintiff shifted to the defendant. Alabama Federal met that light burden by offering defendant's exhibit 546, the memorandum written at the time of Roberts' promotion to assistant vice president, coupled with circumstantial evidence showing that the promotion was a reward to Roberts for "outstanding" service, not the filling of a vacancy. At the time of promotion, Roberts had been the loan origination manager for several years. There was no position known as assistant vice president of loan originations. The promotion in title and pay was intended specially as a reward for Roberts' service to the bank since 1977. This was not a promotion intended to fill a position from among competitive candidates, but specifically intended to reward Roberts. Plaintiff

78

was not "denied" the promotion due to her sex, nor was Roberts given it because of his sex; it was given as a reward for outstanding service. Plaintiff has failed to carry her burden of proving that this promotion was motivated by illegal considerations of sex, either for Roberts or against plaintiff. Thus, the plaintiff's claim of promotional discrimination with respect to the promotion of Roberts to the position of assistant vice president of loan origination is due to be dismissed.

25. Plaintiff also claims that she was discriminatorily denied a promotional opportunity at the time Roberts was promoted to vice president of mortgage loans to replace Jim Maples on January 24, 1984. This promotion made Roberts the head of the Central Division loan department, responsible for general management of mortgage loan origination, processing, closing, servicing, and collection for the Central Division in and around Birmingham and Montgomery. Although not holding the same title, Roberts functioned in the same capacity as Scott and Maples had before him.

26. Plaintiff Putman has failed to establish a *prima facie* case of promotional discrimination with respect to the January 24, 1984, promotion of Roberts because she failed to show that she applied for the position to which he was promoted or otherwise expressed an interest in the position so as to put the defendant on notice that she should be considered. An essential element of a

79

*prima facie* case of discrimination is that the employee "was **qualified** and **applied** for the promotion." <u>Lee v. GTE Florida, Inc.</u>, 226 F.3d 1249, 1253 (11th Cir. 2000)(citing <u>Taylor v. Runyon</u>, 175 F.3d 861, 866 (11th Cir. 1999)(bolding added)); <u>see also</u>, <u>Alexander v. Fulton County, Georgia</u>, 207 F.3d 1303 (11th Cir. 2000); <u>Durley v. APAC, Inc.</u>, ___ F.3d ___, 2000 WL 1873461 (11th Cir., Dec. 26, 2000).   It is true that, when an employer has an informal system of promotions in which there are no postings or other announcements of vacancies, the employee need not show that she applied for the position.   In <u>Jones v. Firestone Tire and Rubber Co., Inc.</u>, 997 F.2d 527 (11th Cir. 1992), that court harkened back to <u>Carmichael v. Birmingham Saw Works</u>, 738 F.2d 1126 (11th Cir. 1984), to explain:

> In <u>Carmichael v. Birmingham Saw Works</u>, we held that
>
>> when there is no formal notice of the job's availability, the plaintiff may have no means, within his own knowledge, of showing whether the employer considered him or not. Furthermore, *when an employer uses such informal methods it has a duty to consider all those who might reasonably be interested,* **as well as those who have learned of the job opening and expressed an interest.** Accordingly, a plaintiff makes out a prima facie case -- that is, he creates a presumption of discrimination and forces the employer to articulate legitimate reasons for his rejection -- *as long as he establishes that the company had some reason or duty to consider him for the post.* The employer cannot avoid a Title VII violation by showing that it incorrectly assumed that the plaintiff

> was uninterested in the job. *When the*
> *plaintiff had no notice of or* **opportunity to**
> **apply for the job,** such a reason for rejection
> is "legally insufficient and illegitimate."

738 F.2d 1126, 1133-34 (11th Cir. 1984)(quoting <u>Harris v.</u>
<u>Birmingham Bd. of Educ.</u>, 712 F.2d 1377, 1383 (11th Cir.
1983)); see also <u>Cox v. American Cast Iron Pipe Co.</u>, 784
F.2d 1546, 1560 (11th Cir.), *cert. denied*, 479 U.S. 883,
107 S. Ct. 274, 93 L. Ed. 2d 250 (1986).


<u>Id.</u> at 533 (italics and bolding added).  This rule logically

recognizes that an employer may not hide the fact of job vacancies

and promotional opportunities to prevent disfavored employees from

seeking them, while also contending that the employee's claim of

discrimination fails because she did not seek the position.  When

the employee has no way of knowing about the availability of the

job, the assertion that the employee failed to seek or express

interest in it is "legally insufficient and illegitimate."  On the

other hand, this rule does not allow, when an employee **knows** of the

vacancy, despite the absence of formal postings or announcements,

that she may sit back, express no interest in the job, and then

complain that she was not considered for it.  When the employee has

actual knowledge of the promotional opportunity, she must pursue

it, letting her employer know of her interest, before she can

fairly say that she was denied the position because of sex.

Otherwise, an employee may silently collect claims for promotional

discrimination with respect to positions the employer honestly had

no reason to believe she was interested in pursuing.  If the promotional opportunity is hidden from her, it is one thing; but if she knows about the opportunity, she may not simply sit by silently only to complain later that the employer did not consider her.[13]

27.  Other circuits have recognized that the underlying rationale for this rule rests on whether the employee has been given a fair opportunity to apply for promotion.  Not all employees want to apply for all promotions, so one cannot assume that, simply because a vacancy in a position existed, the plaintiff actually wanted to be promoted to it.  At least the Sixth, Seventh, and Ninth Circuits have recognized as a corollary to this rule that when an employee has failed to apply for promotion to a new position because the opportunity was not posted or announced by the employer, the employee must prove that she would have applied for it had she been aware of it.  See Wanger v. G.A. Gray Company, 872 F.2d 142 (6th Cir. 1989); Box v. A & P Tea Company, 772 F.2d 1372 (7th Cir. 1985); Reed v. Lockheed Aircraft Corp., 613 F.2d 757 (9th Cir. 1980).  The "applied for the position" requirement of a *prima*

---

[13]  It seems inconsistent with the equitable nature of the relief provided in pre-1991 Title VII cases, such as this, to hold that an employee actually aware of a promotional opportunity, but who remains silent and expresses no interest in being considered for it, can later complain that the employer did not consider her. To seek equitable relief, she must act equitably, and leaving the employer in the dark about her interest in being considered, even when the employer has not otherwise announced the vacancy, is not fair when the employee actually has the opportunity to seek the promotion.

*facie* case reflects standing concerns, making sure that the employee suffered an "injury in fact."

> The second prong of the prima facie test, which requires proof that a plaintiff actually applied for the position allegedly wrongly denied, "reflects standing-like concerns." <u>Loyd v. Phillips Brothers, Inc.</u>, 25 F.3d 518, 523 (7th Cir. 1994). More particularly, as the Seventh Circuit stated in Loyd:
>
> > it closes the causal gap between the employer's decisionmaking process and the complained-of condition of the employee, thus allowing a tentative inference of bad motive on the employer's part.

<u>Grant v. Harcourt Brace & Company</u>, 12 F. Supp. 2d 748, 753 (S.D. Ohio 1998). An exception to the requirement that the employee apply for the promotion arises, as observed in <u>Carmichael</u> and <u>Jones</u>, when the employer fails to post or announce openings, so that the employee is not aware of the opportunity to seek advancement. In these circumstances, the employee need only show that, had she been aware of the promotional opportunity, she would have applied for it.

> When an employer uses a promotion system in which employees do not apply for promotions but rather are sought out by managers, the application requirement of the prima facie case is loosened somewhat. See <u>Reed v. Lockheed Aircraft Corp.</u>, 613 F.2d 757, 761 (9th Cir. 1980); <u>Rodgers v. Peninsular Steel Co.</u>, 542 F. Supp. 1215, 1219-20 (N.D. Ohio 1982). In this situation, the plaintiff can establish the application element of a prima facie case by showing that, had she known of an assistant manager opening, she would have applied. See <u>Rodgers</u>, 542 F. Supp. at 1220.

Box v. A & P Tea Company, 772 F.2d 1372, 1377 (7ᵗʰ Cir. 1985). That proof, however, requires more than a simple expression of general interest in advancement.

> [T]he application requirement is loosened somewhat where a plaintiff can establish that, as a matter of practice, the employer promotes employees into the positions in question without asking for applications or posting the opening so that employees could apply for the positions. [Wanger v. G.A. Gray Co., 872 F.2d 142, 146 (6th Cir. 1989)](citing Box v. A & P Tea Co., 772 F.2d 1372 (7th Cir. 1985), cert. denied, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986)). In such a case, however, "[i]n order for the employee to establish that he or she would have applied for the position if they had been aware of it ... the employee must establish that she had shown more than a mere general interest in the position." Id.

Grant v. Harcourt Brace & Company, 12 F. Supp. 2d 748, 753 (S.D. Ohio 1998)(quoting Wanger v. G.A. Gray Co., 872 F.2d 142, 146 (6th Cir. 1989)).

28. It is indisputably clear that plaintiff Putman was aware of the vacancy created by Maples' resignation on December 31, 1983. Maples had been plaintiff's direct supervisor and she expressed "shock" at his resignation. Clearly, she knew that someone would have to be put in charge of the Central Division loan department to replace Maples. It was more than three weeks later before Roberts was promoted to fill Maples' position as vice president of the loan department on January 24, 1984. Although it is true that defendant did not post or announce the vacancy or seek applications for

promotion, there is no evidence that plaintiff expressed to anyone that she was interested in being considered for promotion to Maples' old position. She certainly knew how to contact the division president, Winston Porter, and the personnel officer, Jim Green, but there is no evidence she did so. Alabama Federal was under no duty to consider her absent some expression of interest by her in the position because this is not a case in which the promotional opportunity was hidden from her. It simply cannot be said that plaintiff has carried her burden of showing, as part of her *prima facie* case, that she either applied for the position or would have applied if she had known of it. She did know of it, yet did not seek it. Because she has failed to make a *prima facie* case, the claim of discriminatory denial of promotion to the position given to Roberts on January 24, 1984, must fail.

29. Likewise, it cannot be established that plaintiff Putman was discriminatorily denied pay equal to comparable male employees. The three males identified by her as comparators, Ronnie Roberts, Tom Macon, and Bev Leigh, performed substantially different duties, such that plaintiff has failed to show that she was similarly situated to them in rank, seniority, and job responsibilities. Tom Macon was a branch manager, responsible for supervising branch offices in Wetumpka and Montgomery. Because these were "remote" branches, he also had responsibilities for soliciting and originating mortgage and construction loans. Similarly, Bev Leigh

85

was the head of mortgage lending in the Western Division in Tuscaloosa, responsible for general supervision of the personnel in the loan department in the Western Division, comparable to Gregg Scott. Clearly, plaintiff Putman, as a loan closing secretary or loan processor/closer was not of comparable rank to Macon and Leigh. Her job duties, while important in themselves, were not as broad as theirs and did not involve managerial supervision of other employees, as did theirs.

30. Comparison of plaintiff to Ronnie Roberts is somewhat more complex because he held several different positions during the tenure of her employment. When plaintiff was first employed in December 1982, Roberts was the mortgage origination manager. From there he progressed to assistant vice president of loan originations in May 1983, and to vice president of the loan department in January 1984. Plainly, Roberts' latter two positions were not comparable in rank or job responsibilities to plaintiff's job as a loan closing secretary or loan processor/closer. His latter two positions involved the management of other employees and more extensive job duties. While plaintiff's position was somewhat more comparable to Roberts' job as mortgage origination manager in terms of job responsibilities, they were not comparable in terms of seniority. Roberts had been employed at Alabama Federal since 1977, almost six years, when plaintiff joined the bank in December 1982. At the time, plaintiff was initially employed at the rate of

$13,200 per year, but raised to $15,200 in July 1983, after only six months.  In May 1983, just before being promoted to assistant vice president of loan originations, a point at which his job duties became substantially different from those of plaintiff, Roberts was making $16,721.  Perhaps more telling, when Roberts was first appointed to be mortgage origination manager July 1, 1979, his rate of pay was $950 per month or $11,400 per year. (See Defendant's Ex. 544).  Comparing starting pay to starting pay, Roberts was paid $1,800 per year less when he was appointed mortgage origination manager than plaintiff when she was hired to be the loan closing secretary.  While some adjustment in plaintiff's starting pay was necessary for inflationary differences between 1979 and 1982, it is clear that the rate of pay at which she began her job at Alabama Federal was not significantly less than the pay Roberts received when he became mortgage origination manager, the position comparable in duties to plaintiff's.  The differences between their rates of pay in 1983 arose simply due to Roberts' seniority at the bank, his almost six more years of service to the bank.  To show a *prima facie* case of wage discrimination, plaintiff must show that she is similarly situated "in terms of **seniority**, rank, and job responsibilities."  Because she lacked the seniority Roberts had, a comparison of her rate of pay in 1983 to his is not meaningful.

31.   A general review of plaintiff's salary history at Alabama Federal also convinces the court that plaintiff Putman was not the victim of wage discrimination.   While it is true that she believed she was worth more to the bank than she was being paid (a circumstance common to most of us), her pay was reasonably in line with that being paid other employees.   In July 1983, she received a $2,000 per year raise, the same Roberts had received just two months earlier when he was promoted to a managerial position.   In 1984, plaintiff participated in a bonus-pay program tied to the number of loans originated and closed.   Although she complains that she received less than several male employees, her situation was different.   She was paid 5 basis points for every loan she closed, regardless of who originated the loan.   Male loan originators were paid more basis points (anywhere from 10 to 35, depending on the type of loan), but their compensation involved risk; they were paid only for what each of them could originate.   Plaintiff was not required to solicit loan business, but was assured compensation from every loan she closed.   Additionally, plaintiff was assured of a base pay of $15,200, plus the basis-points bonus, while several male loan originators like Rick Redmon and Steve Watkins were paid **only** commission, with no assured base pay.   Finally, when the bonus program ended at the end of 1984, plaintiff's base pay rose to $16,400 per year, and then, six weeks later, to $19,000 per year, a little more than two years after joining the bank.   In slightly

more than two years, plaintiff's pay for closing loans rose by
$5,000, an increase of 44%. These circumstances simply do not show
that she was discriminatorily denied equal pay due to her sex.
Defendant is entitled to judgment on all of plaintiff Putman's
claims.

Joan Lacy Gargus

32. Plaintiff Joan Lacy Gargus (referred to in the record as
Joan Lacy) makes the simple claim that she was not paid the same
compensation as Joe McArthur even though she succeeded him in the
position responsible for supervising checking accounts. She also
claims that she was denied promotions to the positions of vice
president and loan officer.[14] The essence of both claims, however,
is that she succeeded Joe McArthur in being responsible for
checking accounts at Alabama Federal, but received neither his
title nor his pay.

33. The plaintiff has established a *prima facie* case of both
pay and promotional discrimination. She has shown that she is a
member of the protected class of females and that she was qualified
for the job of supervising NOW checking accounts as evidenced by
the fact that Porter and Hudspeth, after very careful

---

[14] There is no evidence that plaintiff Lacy ever sought or
expressed any interest in the position of loan officer. She has
failed to make a *prima facie* showing of discrimination with respect
to any claim for that job. Thus, the court will concentrate on the
position of Vice President/NOW Accounts, held by McArthur.

consideration, chose her to take the job.  She was performing substantially the same work as Joe McArthur was performing when he resigned, yet she was paid substantially less than he was paid and was denied the title of Vice President/NOW Accounts.  Although there is no evidence that plaintiff Lacy sought or requested the title, or that she specifically requested the same pay level that McArthur had enjoyed, the bank was obligated to consider those options for her given the fact that she was selected by the bank to replace McArthur and assume substantially all of his duties.  The bank must, therefore, at least articulate a legitimate, non-discriminatory explanation for why she was not awarded McArthur's title and compensation.

34.  Defendant has explained that, in effect, McArthur himself was overpaid for the position he held and that the title of vice president was given to him only because he had been a corporate officer of Home Federal before the merger.  Although McArthur had been Home Federal's corporate controller and treasurer before the merger, he lost those positions when the merger occurred.  He was selected nonetheless to continue serving as a corporate officer of the new Alabama Federal and was given the title of vice president.  Plaintiff, on the other hand, was not a corporate officer of Home Federal at the time of the merger.  She too was about to lose her job because the merger caused the accounting function of the consolidated entities to be merged first in Mobile and later in

90

Tuscaloosa.   Her job in the Birmingham accounting department was slowing being phased out.    Further, defendant contends that McArthur was overpaid to hold the position of Vice President/NOW Accounts because Alabama Federal did not have enough checking account business to warrant the level of pay given McArthur. Consequently, defendant contends that when McArthur left, the bank took the opportunity to reduce the pay level of the position to something more appropriate to its responsibilities.    Alabama Federal also argues that part of the duties performed by McArthur relating to the Automated Clearinghouse (ACH) were split off from the job and given to a different person, Melanie Motes.   Because the job involved fewer duties, it deserved less pay and a lower rank.

35.  Plaintiff Lacy has offered evidence that the defendant's articulated explanation for her lower pay is pretext.  She has not, however, offered any evidence of pretext with respect to Alabama Federal's explanation that McArthur was given the title of vice president because he was a corporate officer before the merger. While the court finds persuasive the bank's explanation that McArthur was made a vice president so that he could continue to serve as a corporate officer as he had before the merger, the bank's explanation for the pay differential between McArthur and Lacy is unpersuasive.  Although it may have been legitimate for the bank to preserve McArthur's corporate-officer's rank, but deny it

91

to Lacy because he was an officer before the merger and she was not, that does not explain the drastic difference in compensation paid to McArthur as Vice President/NOW Accounts and Lacy as NOW Accounts Supervisor. They performed substantially the same duties in overseeing Alabama Federal's NOW checking account operations. The bank's assertion that McArthur himself was overpaid is undercut both by McArthur's testimony that he was not overpaid for the work he did and by Hudspeth's own memorandum of September 16, 1985. In that memorandum, Hudspeth recounted that one of the reasons plaintiff Lacy was offered the job was that "upper management did not wish to go out in the market and pay what it would have taken to get a highly qualified person." In it, he described the job as "a very demanding one," which is consistent with McArthur's testimony as well. Hudspeth testified at trial that to hire someone with experience in checking accounts away from a commercial bank would have required significantly more compensation than what Lacy was paid. Furthermore, it is clear that McArthur's primary duties were the supervision of NOW Accounts. Although he was a corporate officer, he no longer had any additional special duties due to it, unlike the position of corporate treasurer he held before the merger. Also, even though it is clear that the ACH duties were split off from the job and not given to plaintiff, there is no evidence that these duties comprised a substantial part of the job so as to warrant lesser pay when those duties were

92

removed.   McArthur's description of his job duties support the finding that the ACH duties were not a substantial part of the job. The court concludes that the job of supervising the defendant's NOW Accounts was worth at least what McArthur was being paid, and that the assertion that Lacy was paid less than McArthur because he was overpaid for the work and responsibilities required by the position is not worthy of belief and is a pretext.   The court is led to the conclusion that plaintiff Lacy was paid less than McArthur, at least in material part, because she is a woman, in violation of her rights under Title VII.   She is entitled to recover the difference between her pay as NOW Accounts Supervisor and that of Joe McArthur, as Vice President/NOW Accounts, for the period between when she took over the position in August 1983 and when she was removed in February 1985.[15]   Because the difference was $8,640 per year for approximately a year and a half, plaintiff Lacy is entitled to recover the sum of $12,960 in back-pay, plus interest.

<u>Jean Bryant Piersol</u>

36.   Plaintiff Jean Bryant Piersol alleges a claim for wage discrimination, claiming that she was paid less than similarly

---

[15]   Plaintiff has not asserted a demotion claim with respect to her removal from the position of NOW Accounts Supervisor nor can she assert a claim for termination in September 1985.

situated male employees Charles Compton,[16] Jack Phillips, Ronnie Hudspeth, Whit Walter,[17] and Rod Schlosser.  Plaintiff has failed, however, to establish a *prima facie* case of wage discrimination because she cannot show that she was similarly situated in seniority, rank, and job responsibilities to any of her alleged comparators.

37.  Plaintiff's attempt to compare herself to Jack Phillips is meaningless.  First, Phillips' employment with Alabama Federal came more than two years after plaintiff was terminated.  Although both were essentially the head of the personnel department during their employment, Phillip's duties were significantly greater than plaintiff's.  By the time Phillips was hired, Alabama Federal's workforce had doubled in size and involved employees in more than one state.  The personnel department itself had grown and was providing significantly greater services to Alabama Federal's workforce than had been true under plaintiff.  Although both Phillips and plaintiff were, at separate times, head of personnel, the jobs they performed were not substantially similar. Furthermore, it cannot be argued that Alabama Federal intentionally and purposefully discriminatorily denied plaintiff pay comparable

---

[16] Erroneously identified in the pretrial order as Charles *Crumpton*.

[17] Erroneously identified in the pretrial order as Walter Whitt.

to that of Phillips when plaintiff left her employment more than two years *before* Phillips was hired.  At the time decision-makers at Alabama Federal were setting plaintiff's pay, they could not have foreseen what Phillips was to be paid almost three years later.  The fact that Phillips later was paid substantially more than plaintiff does not mean that plaintiff was discriminatorily denied equal pay due to her sex.  This is not a situation, as discussed above concerning plaintiff Lacy, where the plaintiff *follows* the male employee into a substantially similar job, but is paid less.  Here, plaintiff preceded Phillips by more than two years, which precludes any logical comparison between them and leaves the court unable to infer that plaintiff was the victim of discrimination in pay.

38.  Plaintiff also has not established that she was similarly situated in rank, seniority, or job responsibilities to Hudspeth, Compton, Walter, or Schlosser.  By 1985, Hudspeth was Executive Vice President, acting essentially as the regional manager for the Central Division of Alabama in Birmingham and Montgomery.  Porter was gone and Hudspeth was responsible for both lending and operations in the Central Division, with actual managerial supervision over hundreds of employees.  He had been with Home Federal and Alabama Federal for almost twenty years when plaintiff arrived in February 1985, and he far out-ranked her.  Plaintiff simply cannot compare herself to Hudspeth for any meaningful wage

discrimination analysis.[18]   Likewise, plaintiff cannot compare
herself to Charles Compton, who had been with Heritage Federal
(Tuscaloosa) and Alabama Federal for more than twenty-three years
when plaintiff arrived.   In 1985, Compton was the Senior Vice
President for Marketing and Product Development. He far out-ranked
plaintiff in the corporate hierarchy and his job responsibilities
were completely unlike those of plaintiff's in Human Resources.
Thus, Compton is not a meaningful comparator to plaintiff for a
wage discrimination claim.

39.   Whit Walter was hired in May 1985 to be the Vice
President of Commercial Real Estate Lending.  Rod Schlosser was
hired in November 1984 as Vice President/Finance to form and
oversee a unified accounting department for the merged entities.
Their duties were not substantially similar to those of plaintiff,
working as Vice President/Human Resources.  Their functions within
the bank were different, as were their value to the bank.  Their
responsibilities involved overseeing commercial lending origination
and closing and accounting, not personnel.  It is not enough to
establish a *prima facie* case to say simply that all three were vice
presidents.  Plaintiff must show a substantial similarity of job
responsibilities because high-level management officers are not

_____

[18] Plaintiff's pay in 1985 was $35,000, while Hudspeth's was
$37,000.  He was paid only $2,900 per year more than plaintiff,
despite the fact that he held a higher rank, had more
responsibilities, and had almost 20 years greater seniority.

fungible, often performing radically different duties for the employer. The relative importance and value of one area of operation over another with the hierarchy of an organization precludes the simple comparison of job titles and ranks when assessing job responsibilities. Vice presidents of commercial lending and accounting are not the same as vice presidents of human resources, and they cannot be compared for wage discrimination purposes.

Gail Figg

40. Plaintiff Figg presents claims for discriminatory denial of pay equal to that of male employees Hal Fowler, Larry Trice, Ken Reynolds, Jim Maples, and B.G. Hines, and discriminatory denial of promotion to the positions of Loan Services Coordinator[19] and vice president. Although the court concludes that she was not denied any promotion due to illegal sex discrimination, it does find that

---

[19] The evidence establishes that plaintiff **was** promoted to the position of Loan Services Coordinator, which was the primary assistant to the Vice President-Loan Servicing. Although plaintiff wanted the vice president's job given to Ken Reynolds, she accepted the position of Loan Services Coordinator under Reynolds when she did not get the job Reynolds got. Thus, there is no evidence that plaintiff was denied promotion to the position of Loan Services Coordinator. Plaintiff also asserts that in June 1983 Petty nominated her to be a statewide loan coordinator. That was not a promotion or new job, however, simply an assignment to work with other divisional loan servicing coordinators in establishing uniformity in computer data. The court will focus on the denial of promotion to Vice President-Loan Servicing.

she was discriminatorily denied pay equal to male divisional operations officers.

41. Turning first to plaintiff's promotion claim, the essence of this claim centers on whether she was denied promotion to the position, ultimately designated as Vice President-Loan Servicing, responsible for creating and overseeing a centralized loan servicing department for the entire merged bank. The first opportunity for that promotion occurred in late 1984 when Ken Reynolds was named Vice President-Loan Servicing. Plaintiff claims that the position was filled on two earlier occasions by Jim Maples and, later, B.G. Hines, and that she should have been considered for promotion on each of those occasions. The court finds this unpersuasive; there was no vacancy filled or new position created on either of the two occasions mentioned by plaintiff. In November 1983, Tom Wicks, who had overall responsibility for unifying the mortgage loan practices of the newly-created Alabama Federal, designated Jim Maples to lead a committee in an effort to standardize the loan servicing practices of the four divisions. At the time, Maples was Senior Vice President of Loans in the Central Division and had extensive experience not only with loan servicing, but also with all aspects of mortgage lending. More importantly, Maples was not promoted or given a new title or position or a raise in pay; he simply was designated to lead a committee composed of loan servicing representatives from all four divisions, including

plaintiff Figg, to establish standards for inputting mortgage loan data into a central computer system. The team was to accomplish a conversion of the four separate computer systems into a single system. There was no promotional opportunity, no new position created; Maples simply was to lead a team assigned to carry out a specific task. Later, when Maples quit on December 31, 1983, no one was designated to lead the team and it never got off the ground. In March 1984, Wicks assigned B.G. Hines the research task of exploring the various ways escrow was handled in the divisions and at other, outside mortgage companies, and to report to Wicks with a recommendation for unifying the mortgage loan servicing operations. Hines was not promoted or given a new job or raise in pay; he simply was given a research project to gather information and report back to Wicks. Neither of these occasions was a promotional opportunity, and plaintiff has not shown that she was discriminatorily denied any promotion at either of these times.

42. A true promotional opportunity came sometime during the late summer or early fall of 1984, when Ken Reynolds was selected to be the new Vice President-Loan Servicing, charged with organizing and supervising a new centralized loan-servicing department, headquartered in Birmingham. Plaintiff has made a *prima facie* showing of discrimination in that she is female, she was qualified for the job, she was rejected for it, and it was filled by a male with equal or lesser qualifications. Although

99

plaintiff did not "apply" for the position, it was never posted or announced and she was unaware of the opening. Nonetheless, she had expressed to her supervisor, Buddy Petty, on a number of occasions that she was interested in the job of leading a centralized loan servicing department for the entire bank. Additionally, Tom Wicks was aware of her active involvement in trying to establish uniform loan-servicing practices, working with Maples and other loan servicing supervisors. Given her expressed interest to Petty and Wicks' awareness of her interest, the bank was under a duty to consider her even without an "application" from her. The defendant has articulated a legitimate, non-discriminatory reason for its selection of Reynolds, and that is that Wicks had a long, familiar history with Reynolds and was confident in his abilities. Reynolds and Wicks worked together in Tuscaloosa at the old Heritage Federal. While at Heritage, Wicks had assigned Reynolds to create a mortgage-lending subsidiary for Heritage, which he carried out well in Wicks' opinion. Having seen Reynolds start a new entity from scratch, Wicks was confident he could start the centralized loan-servicing department. Plaintiff has failed to show that this articulated reason for Reynolds' selection is a pretext for discrimination. It is certainly true that Wicks was much more familiar with Reynolds than he was with plaintiff Figg. Wicks had never worked with plaintiff, while he had worked closely with Reynolds. Wicks' opportunities to judge the skills and talents of

100

Reynolds were greater and, thus, he had more confidence that Reynolds could successfully complete the task of centralizing loan servicing. The evidence simply does not suggest any basis for disbelieving this explanation, nor does it show discrimination based on sex. At worst, it shows that Wicks chose the person he knew best, not because of his sex, but because of his long familiarity with him. Thus, plaintiff's claim that she was discriminatorily denied this promotion fails.

43. A second promotional opportunity occurred in late 1986, when Reynolds was removed as Vice President-Loan Servicing by Rod Schlosser and replaced with Hal "Buzz" Fowler. Once again plaintiff has made a *prima facie* showing in that she is female, she was qualified and applied[20] for the position, she was rejected, and it was filled by a male with equal or lesser qualifications. The defendant has articulated a legitimate, non-discriminatory explanation for her rejection, that her close association with Reynolds, as his chief assistant, disqualified her because the management problems in the department developed while Reynolds and she were in charge of it and someone with strong managerial skills was needed to establish order in it. Plaintiff has failed to show that this explanation is a pretext for discrimination. It is

---

[20] On this occasion, plaintiff Figg clearly applied for the job. As soon as Reynolds told her he had been removed, she went to Schlosser to seek it.

undisputed that Schlosser and his boss, Skipper Goodwin,[21] were dissatisfied with the loan servicing department, describing it as "in disarray."  To make a change, they believed that someone with strong managerial skills, not necessarily loan-servicing skills, had to be put in charge of the department.  For that reason, they went outside the department to bring in new leadership.  There is no evidence to suggest that this explanation is false or unworthy of belief or otherwise a pretext for discrimination.  Plaintiff was rejected not because of her sex, but because she was viewed as being part of the old, ineffective leadership of the department. Whether fair of unfair, this does not prove sex discrimination, and the claim must fail.

44.  Plaintiff Figg also asserts that she was discriminatorily denied pay equal to five male comparators, Hal Fowler, Larry Trice, Ken Reynolds, Jim Maples, and B.G. Hines.  The court finds merit in the comparison to Hal Fowler, but not the other four.  First, no evidence was adduced concerning Larry Trice and, therefore, plaintiff has failed to carry her burden of showing that she was similarly situated to him in rank, seniority, and job

---

[21] This also is an example of corporate purging at work.  The leadership of Alabama Federal changed in September 1986, when CEO Jim Gambill resigned under pressure.  He was replaced by Skipper Goodwin, who began to move in officers loyal to him to replace those under the previous leadership.  Because Tom Wicks was a close ally of Gambill's, he and, through him, Reynolds fell into disfavor.  The removal of Reynolds, therefore, was partly the result of the downfall of Gambill.

responsibilities.   The comparisons to Reynolds and Maples fail because their jobs were not only of a different rank, but involved substantially dissimilar duties.   Maples was vice president over the entire loan department for the Central Division, supervising not only loan servicing, but loan origination, approval, processing, and closing.   Reynolds was plaintiff's supervisor, plainly higher in rank than she,[22] occupying a job demanding more pay.   Likewise, B.G. Hines' job duties were unlike plaintiff's.   He worked in operations auditing, not lending or loan servicing, and his first exposure to loan servicing was in the research project assigned to him by Wicks.   He simply was not similarly situated to plaintiff.

45.   In her capacity as Northern Region Operations Officer, plaintiff has shown that she was similarly situated in rank, seniority, and job responsibilities to Hal Fowler, the Western Division Operations Officer.   In addition to her duties as Buddy Petty's secretary and Northern Region Loan Servicing Manager, plaintiff Figg also became the Northern Division Operating Officer in November 1983, when she succeeded Bill Warren.   Although her job responsibilities were substantially the same as Fowler's, she was being paid $16,200 annually (during 1984) while Fowler was paid $31,000 (during 1984).   Even if some of the differential could be

---

[22]   The court reiterates its findings and conclusion that the promotion of Reynolds over plaintiff was not illegal sex discrimination.

explained by the length of time each had served as an operations officer (Fowler had been an operations officer since 1977, while plaintiff became one in November 1983), it can not explain why Fowler's salary was 93% higher than plaintiff's. Defendant has offered no explanation, legitimate or otherwise, to explain the gaping disparity in pay between these similarly situated employees. Because plaintiff Figg was discriminatorily denied pay equivalent to that paid Fowler, she is entitled to recover the difference between her pay as operations officer and that paid Fowler for the period from November 1983 to January 1985, when she left that position to become the loan services coordinator under Ken Reynolds. Because that difference was $14,800 annually for a period of about one year and three months, plaintiff Figg is entitled to recover the sum of $17,500 in back-pay, plus interest.

<u>Tuscaloosa Loan Department Personnel</u>

46.    Two female employees in the Western Division loan department also have asserted claims for promotion and pay discrimination. Alys Liddy alleges that she was discriminatorily denied promotions to the positions of supervisor, loan originator, loan officer, assistant vice president, and vice president. Further, she claims that she was discriminatorily denied pay equal to that of several male comparators, Tom Cobb, John Marbury, Tom Seimers, John Adams, Bev Leigh, and John Alexander. Kathryn

Robertson makes similar claims that she was discriminatorily denied promotions to the positions of branch manager and loan officer, and that she suffered pay discrimination compared to her male comparators Mike Woodall, Tom Wicks, John Marbury, Bev Leigh, John Adams, John Alexander, Jerry Brooks, Joseph Hailey, Philip Holly, and Tim Hollander. (See Pretrial Order).

47.   Turning first to plaintiff Robertson's claims, the court notes that there was no evidence offered concerning any opening, vacancy, or promotional opportunity for the position of branch manager in the Western Division during plaintiff's employment. Because defendant had four distinct organizational regions, it is not surprising that potential openings in one division were not announced in other divisions.   In any event, plaintiff has offered no evidence to establish that, had she known of opportunities to be promoted to branch manager, she would have applied.   She offered no evidence of any branch manager position she claims she would have sought.   Box v. A & P Tea Company, 772 F.2d 1372, 1377 (7th Cir. 1985).   Without that proof, she has failed to show a *prima facie* case of discrimination with respect to promotion to such a position.

48.   Plaintiff Robertson also claims that she was denied a promotion to the position of loan officer.   In February 1986, plaintiff was approached by Cobb and Leigh about taking the position vacated by John Marbury upon his transfer to AlaFed

Mortgage in Birmingham.   Marbury had been a loan counselor. Reluctantly, plaintiff agreed, although she acknowledges that she had doubts at the time that she was ready for the position.   There is no evidence that plaintiff ever sought or applied for a loan officer's job before that time.   Indeed, her reluctance upon being approached by Cobb and Leigh suggests that she was not interested in such a job.   Although it is true that she was given the title "loan counselor/processor," she performed essentially all the duties of a loan officer, soliciting and receiving loan applications, processing them, and presenting them to the loan committee for approval, as Marbury had done as a loan counselor. There is no evidence that a "loan officer" position was available to which plaintiff Robertson could be promoted; the position that **was** available was Marbury's position as a "loan counselor." Insofar as plaintiff asserts that she should have received the promotion to loan officer that plaintiff Liddy received in April 1985, she cannot establish a *prima facie* case because the position was filled by a woman, plaintiff Liddy.   There can be no presumption of sex discrimination when the sought-after promotion goes to another member of the protected class.   Plaintiff Robertson's promotion claims fail.

49.   Plaintiff Robertson also alleges that she was discriminatorily denied pay equal to that of several male comparators.   Two of these are clearly not appropriate comparators

106

because they held high-ranking jobs; indeed, frequently, they were her supervisors and superiors.   Tom Wicks and Bev Leigh were, respectively, the regional manager and head of the Western Division loan department.   As escrow supervisor and loan counselor/ processor, plaintiff cannot realistically compare her duties to those of Wicks and Leigh.   Additionally, no evidence was offered regarding the positions or job duties of Joseph Hailey, Philip Holly, and Tim Hollander.   Without some evidence that they were performing substantially similar work to that performed by plaintiff, she has not carried her burden of proving a *prima facie* case of wage discrimination, at least as to these alleged comparators.   Plaintiff's comparison to Mike Woodall and Jerry Brooks also fails because it is clear that these two men worked as vice presidents of consumer lending in the Central and Southern Divisions, exclusively in *consumer* lending, not real estate lending.   They were not only higher in rank in the organization, but their job responsibilities were not substantially similar to those of plaintiff Robertson.

50.  Plaintiff also claims that John Alexander and John Adams were similarly situated to her in terms of seniority, rank, and job duties, but were paid far more than she.   Alexander worked as a loan officer/originator in the main Tuscaloosa office of Alabama Federal for about two years after the merger, from 1982 until he was appointed Quad-Cities branch manager in 1984.   This job was a

107

special accommodation of the fact that he had been displaced as a branch manager at old Home Federal's Tuscaloosa branch, which closed at the time of the merger.  With the assistance of his old boss, Winston Porter, Alexander was given the task of developing construction loan business.  During that time, he was employed to develop contacts with builders and realtors as an avenue for soliciting construction lending business.  Although paid on salary, his work involved more solicitation and origination of business out "on the street" than taking loan applications and processing loans. Plaintiff Robertson's job as escrow supervisor was largely clerical, although it also involved meeting with builders to assess the degree of completion of the building project for disbursement of draws against the construction loan.  Almost incidental to this completion assessment, plaintiff sometimes brought back to the bank applications for permanent financing to replace the construction loan of the builders.  It was not her job, however, to solicit and secure new construction or mortgage lending business.  The fact that she did originate some loans was entirely incidental to her role as escrow supervisor.  Her job responsibilities as escrow supervisor were not substantially similar to those of Alexander. Likewise, plaintiff's work as escrow supervisor was not comparable to the work of John Adams, a loan officer in the Quad-Cities (Northern Division) branch.  He, too, was engaged principally in solicitation and origination of mortgage loans and the supervision

108

of the loan processing staff, with the added duties of collecting and monitoring delinquent accounts. See Defendants' Ex. 485.

51.  When plaintiff Robertson was given the position of loan counselor/processor in March 1986, to replace John Marbury, she took on the essential duties of a real estate loan officer even though the title was only loan counselor/processor.  As a loan counselor/processor, she performed all of the ordinary and expected duties of a loan officer, from loan origination and processing to serving on the loan approval committee.  Even in this position, however, her duties were not comparable to those of Adams, who had the added duties of collections officer, requiring him to monitor and collect delinquent loans.  The court is persuaded, however, that plaintiff's work as a loan counselor/processor was **substantially** similar to Alexander's.  Even if Alexander was more active in seeking out construction loan business, plaintiff Robertson also had contacts with builders through which she sought and originated construction loans and permanent mortgage financing business.  She took loan applications, processed the applications, and served on the loan approval committee, just as Alexander had done before he left in 1984.[23]  The fact that plaintiff performed

---

[23]  Plaintiffs have offered evidence that Alexander made about $32,000 in 1984, but for most of that year (after February) he was employed as the Quad-Cities branch manager, not a loan officer, and the pay comparison to plaintiff is not meaningful.  There is no evidence of what he was paid in 1983.

the job of a loan officer some three years after Alexander left, however, does not explain why he was paid $22,000 in 1982 and she was paid $14,100 in 1986.[24]   Indeed, one would expect rates of pay to increase over time, not decrease.   Thus, the unexplained pay disparity between Alexander and plaintiff Robertson raises an unrebutted presumption of sex discrimination in pay.   Plaintiff Robertson is entitled to recover the difference between her pay as a loan counselor/processor and $22,000 for the period from March 1986 to September 1987, when she was placed on commission.   Because the pay difference was $7,900 per year, lasting for about a year and a half, plaintiff Robertson is entitled to recover the sum of $11,850 in back-pay, plus interest.

---

[24]   The court notes that Alexander's pay at every position he held seems to have been high in comparison to similarly-situated employees, male and female.   As Quad-Cities branch manager, his pay rose to over $36,000 per year, higher than virtually all other branch managers and even some vice presidents.   For example, in 1984, while Alexander was making over $32,500 as a remote branch manager, Ronny Husdpeth, as executive vice president of the entire Central Division, made only $32,280 (excluding origination commissions of about $5,000).   Percy Phillips was the vice president of consumer loans for the Northern Division in 1984, yet he made only $19,692.   Hal Fowler, Vice President of Operations in the Western Division, made $31,100.   In 1983, Joe McArthur, the Vice President of NOW Accounts for the entire Alabama Federal organization was paid only $27,000.   In 1985, Tom Cobb was the vice president over all lending in the Western Division, but was paid only $27,539.   Other remote branch managers in 1984 made far less than Alexander: Jimmy Ross ($23,562), Carlos Pressnell ($17,939).   The evidence does not reveal why Alexander's salary history was consistently higher than comparable employees, male and female.

110

52.   Plaintiff Robertson's job as loan counselor/processor also was virtually indistinguishable from the job Marbury had held; indeed, she was offered **his** position after he transferred to AlaFed Mortgage in Birmingham.  Even so, Marbury had been paid a salary of $15,000 per year when newly hired, but plaintiff Robertson was paid only $14,107.18 for all of 1986, the first year she assumed the position.  She has shown a *prima facie* case of wage discrimination with respect to her comparison to Marbury, but the defendant has not articulated any reason why she was paid almost a thousand dollars per year less than Marbury.  By 1987, however, plaintiff Robertson and several other loan officers and counselors were converted from salary to commission.  At that point, because of the variability of each person's ability and success at soliciting business, meaningful comparisons of wages ended.  Even though she has shown a *prima facie* case of wage discrimination in comparison to Marbury, this disparity is far less than that between her and Alexander, for which she is awarded a recovery.  Because her recovery on the wage discrimination claim involving Alexander is greater, she may not receive a separate recovery on this claim.  It is subsumed in the recovery on the wage-claim comparison to Alexander.

53.   Plaintiff Alys Liddy alleges that she was discrimi-natorily denied promotions to the positions of supervisor, loan originator, loan officer, assistant vice president, and vice

111

president.   As to the first of these positions, supervisor, plaintiff has failed to establish a *prima facie* case.  There is no evidence that any position designated as "supervisor" was available or that there was any promotional opportunity to any position so identified.  On the loan originator position, depending upon how it is viewed, plaintiff has failed to present a *prima facie* showing of discrimination or has failed to show that the employer's explanation for denial of the promotion was false or pretext.  In 1985, Virginia Wheeler either was promoted or given the position of "outside loan originator."  She had been the principal mortgage loan officer in the Tuscaloosa main office.  If plaintiff complains that she was denied that promotion, she has failed to show that the position was given to a male rather than her.  As the position went to a female, Virginia Wheeler, no presumption of discrimination arises, and plaintiff has failed to present a *prima facie* showing. Later, after the promotion of Virginia Wheeler, plaintiff Liddy approached Bev Leigh with a request that she also be allowed to work as a commissioned loan originator, which he rejected, saying that the Tuscaloosa market was not big enough to accommodate two loan originators from the same bank.  Insofar as plaintiff Liddy has made a *prima facie* showing on these facts, she has failed to show that the articulated reason for the denial — the market was not big enough for two originators — was false, not worthy of belief, or otherwise a pretext for discrimination.  She also claims

112

that she was denied a promotion to loan solicitor when John Marbury transferred to defendant's newly-created subsidiary, AlaFed Mortgage, to take such a commission-based job in Birmingham in 1986. There simply is no evidence that plaintiff sought this position in Birmingham or that the defendant had any reason to believe that she was interested in a position in Birmingham.[25] The claims, therefore, that she was the victim of discrimination when she was not promoted to supervisor or loan originator, fail.

54. The court already has concluded that, as practiced in the Tuscaloosa main office of the Western Division of Alabama Federal, there was no substantive difference in the job duties and responsibilities of a loan counselor compared to a loan officer. Plaintiff Liddy, at least, performed all of the substantive duties of a loan officer from the day she was hired, including taking mortgage loan applications, processing the applications, presenting them to the loan committee for approval, and participating as a voting member of the loan committee herself. Although it is true that she was hired as a loan counselor to replace the departed loan

---

[25] The evidence on this claim is very scant. Although it is clear the Marbury transferred to AlaFed Mortgage in Birmingham to become a commission-based loan solicitor, no evidence was offered by plaintiff as to whether she knew of this opportunity or that it was not posted or otherwise hidden from her. Absent some evidence from plaintiff that she either applied for the job or was not obliged to apply because it was hidden from her, she has failed to present a *prima facie* case of discrimination. The evidence simply is insufficient to establish that plaintiff can bring herself within the <u>Carmichael</u> rule.

officer, John Alexander, she was promoted officially to the position of loan officer in May 1985, when Virginia Wheeler became the outside loan originator in March or April of that year. Strictly speaking, therefore, plaintiff was promoted to loan officer on the first occasion the position became available and was not discriminatorily denied a promotion. Nonetheless, as the court will discuss further below, she acted fully in the capacity of a loan officer almost from the first day she was hired, but was not paid comparably to other male employees doing similar work. The true nature of plaintiff's claim in this regard is not that she was not promoted to the position of loan officer, but that, in fact, she was discriminatorily denied pay comparable to that paid male employees doing essentially the same work. Thus, the court will analyze this claim below as a wage discrimination claim.

55. Plaintiff also asserts that she was denied promotions to assistant vice president and vice president. It is unclear what specific job positions she refers to, unless it is a reference to the job of Vice President/Lending, for which Tom Cobb was hired in January 1985, and again the vacancy for that job when Cobb was terminated in January 1987. The court believes that plaintiff has failed to make a *prima facie* showing of promotional discrimination on either of these occasions because she never applied for the job or expressed a specific interest in it. Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000)(citing Taylor v. Runyon, 175

F.3d 861, 866 (11th Cir. 1999)(*prima facie* showing requires proof that plaintiff was qualified for and **applied for** the job); see also, Alexander v. Fulton County, Georgia, 207 F.3d 1303 (11th Cir. 2000); Durley v. APAC, Inc., ___ F.3d ___, 2000 WL 1873461 (11th Cir., Dec. 26, 2000).  Although she asserted at trial that she never expressed an interest in it because she was unaware a position was available, that does not square with the facts. Plaintiff was hired by Bev Leigh in his capacity as head of the Western Division loan department.   The regional manager or president was Tom Wicks.  Later that year, Leigh replaced Wicks as the regional manager, thus opening a vacancy for the head of the loan department in which plaintiff worked.  She clearly was aware that Leigh was promoted and that the vacancy he left as head of the loan department probably would be filled, yet she never approached Leigh (or anyone else) to apply for consideration or express an interest in the job of head of the loan department.   Leigh testified that, if she had applied, he would have considered her. Thus, similar to the promotion claim made by plaintiff Betty Putman, plaintiff had actual knowledge of the vacancy caused by the promotion of her department head; therefore, she cannot avoid the *prima facie* requirement that she apply for the position.[26]

---

[26] To be clear, the court concludes that Carmichael v Birmingham Saw Works does not apply to this case.  Unlike Carmichael, where job vacancies were actively hidden from potential black applicants, plaintiff in this case actually knew of the

Likewise, plaintiff cannot make a *prima facie* showing with respect to denial of promotion to the job of Vice President/Lending in January 1987, when Cobb was terminated, because she once again failed to apply for it or express interest in it, even though she knew Cobb had been terminated. Even if she had done so, and thereby established a *prima facie* showing of discrimination, the defendant has offered evidence that the reason she was not promoted to the position is because the position was eliminated. Leigh testified that he was instructed to terminate Cobb because the bank needed to reduce costs and because the Tuscaloosa office was "top heavy" with managers. After Cobb was terminated, no one ever was hired or promoted to fill the position of Vice President/Lending, consistent with the defendant's contention that the position was eliminated in a reduction in force. Even when plaintiff assumed some of the duties of the job, other duties were shifted to Rhonda Denton, effectively eliminating the position by dividing it among other employees. Plaintiff has failed to carry her burden of proving that this articulated reason for denying her a promotion to that position was false, not worthy of belief, or mere pretext for discrimination.

---

vacancy because she knew her supervisor had been promoted to regional manager, thereby leaving the position of head of the loan department open.

56. Plaintiff also claims that she was subjected to wage discrimination when compared to several male employees, Tom Cobb, John Marbury, Tom Siemers, John Adams, Bev Leigh, and John Alexander, allegedly performing substantially similar work. The court finds that plaintiff Liddy has failed to establish a *prima facie* case of wage discrimination when compared to Cobb, Siemers, Leigh, and Adams. First, plaintiff cannot meaningfully compare her job rank, seniority, and responsibilities to Siemers and Leigh, as these men always were clearly her superiors in rank. Leigh was head of the loan department and then regional manager of the Western Division. When Leigh was removed as the regional manager, Siemers was brought in to replace him. Thus, Siemers and Leigh were always superior in rank to plaintiff. Further, even if one could argue that Leigh's demotion to "senior lender" made him equal to plaintiff, he still far surpassed her in terms of seniority, having been with Alabama Federal (and its predecessor, Heritage Federal) for many years longer than plaintiff had been. Thus, neither Leigh nor Siemers are meaningful comparators to plaintiff Liddy.

57. Likewise, plaintiff cannot show a substantial similarity between herself and Cobb and Adams. As already noted, Adams had additional duties as the collections officer for the Quad-Cities branch. He also worked alone in the Quad-Cities branch, without any processors or closers to assist with the preparation and

117

closing of loans. Thus, Adams's job duties, not to mention his seniority (he had been with the bank or its predecessor since 1975), were not substantially similar to plaintiff's. Further, even though plaintiff assumed *many* of the job responsibilities of Cobb when he was terminated, she did not take on all of his duties. It is clear that, although Cobb, as Vice President/Lending, was responsible for overseeing both mortgage *and* consumer lending in the Western Division, plaintiff took over responsibility only for mortgage lending. Consumer lending was put under the management of Rhonda Denton. Thus, plaintiff's position as Mortgage Loan Production Supervisor did not entail the same breadth and level of responsibility that Cobb's position as Vice President/Lending did. Consequently, plaintiff cannot establish a *prima facie* case of wage discrimination based on her comparison to Cobb.

58. Plaintiff's comparisons to John Alexander and John Marbury, however, do establish a *prima facie* case of wage discrimination. Plaintiff was employed, nominally, as a loan counselor and paid $10,400. A year later, and while plaintiff was still being paid $10,400, John Marbury was hired as a loan counselor also, but paid $15,000 per year, even though he had less seniority at the bank and far less experience in real estate mortgages. Defendant has not articulated any legitimate, non-discriminatory reason for this disparity, so plaintiff is entitled at least to recover the difference between her pay and Marbury's.

An even greater disparity, however, existed between plaintiff's pay and that paid John Alexander.  From 1982 to 1984, Alexander worked as a "loan officer" in the Western Division, soliciting and developing construction and residential lending business. Plaintiff was hired as a "loan counselor" in February 1984, performing substantially the same type of work as Alexander; indeed, she was hired to replace him.  During 1982, Alexander was paid approximately $22,000 per year, but there is no evidence about his 1983 pay.[27]  Defendant has offered no explanation for the disparity of $11,600 between what was paid to plaintiff and what was paid to Alexander for essentially the same work.  Plaintiff Liddy is entitled to recover the difference between her pay and $22,000[28] for each of the years 1984, 1985, 1986, and that part of 1987 before being demoted to loan processor in September 1987.[29]

---

[27]  Plaintiffs have offered evidence that Alexander made about $32,000 in 1984, but for most of that year (after February) he was employed as the Quad-Cities branch manager, not a loan officer, and the pay comparison to plaintiff is not meaningful.

[28]  The court recognizes that, ordinarily, employees could expect increases in pay over time.  However, in calculating the difference between what plaintiff Liddy was paid and what she should have been paid, the court has no way of predicting whether or how large subsequent pay increases for plaintiff might have been had she started in 1984 at the equal-pay level of $22,000.  To avoid sheer speculation about whether and how much such pay increases might have been, the court has calculated back-pay on the basis of the known amount of $22,000.

[29]  Plaintiff has not asserted a claim for discriminatory demotion.  See Pretrial Order.

119

The following chart reflects the difference between plaintiff's actual pay and what she should have been paid for this period:

| Year | Actual Pay | Pay Due | Difference |
|------|-----------|---------|-----------|
| 1984 | $10,193 | $22,000 | $11,907 |
| 1985 | $12,885 | $22,000 | $9,115 |
| 1986 | $15,499 | $22,000 | $6,501 |
| 1987[30] | $13,334 | $16,500 | $3,166 |
| | | TOTAL: | $30,689 |

Plaintiff Liddy, therefore, is entitled to recover the sum of $30,689 in back-pay, plus interest.

Carol Manning Woodruff

59.   Plaintiff Woodruff alleges a claim for discriminatory denial of pay equal to that paid to comparable male employees Pearce Pratt, George Youngson, and Owen Skinner.  The evidence at trial clearly established that each of these three male comparators left the employment of Heritage Federal (Alabama Federal's predecessor) before the merger occurred.  Although the exact date Pratt and Youngson left is unclear, Skinner left the employment of Heritage Federal in April 1980, resigning the position of vice

---

[30]   Because the illegal pay discrimination ended in September 1987, the court has calculated the pay differential on the basis of three-fourths of the year.  Plaintiff's total pay for 1987 was $17,659, three-fourths of which is $13,334.  Three-fourths of the sum $22,000, which should have been paid, is $16,500.  Thus, subtracting $13,334 from $16,500, the illegal pay disparity for 1987 up to September was $3,166.

president and corporate secretary.   Because Skinner held the
highest paying position of the three comparators, any illegal wage
discrimination with respect to plaintiff's pay compared to his
would necessarily also encompass any wage disparity between
plaintiff and the other two.   Therefore, the court will focus on
Skinner as plaintiff's comparator.

60.   Plaintiff has established a *prima facie* case of wage
discrimination based on her comparison to Skinner.   While Skinner
acted as Heritage Federal's corporate secretary and personnel
director, plaintiff assisted him, maintaining various records
Skinner was responsible for and helping him prepare for and carry
out certain administrative duties he performed for the board of
directors.   Skinner continued to perform the personnel functions of
Heritage from 1977 until he left in 1980.   When Skinner left in
April 1980 to take another job, plaintiff was promoted to the
position of *assistant* corporate secretary and assigned all of
Skinner's previous duties, both as corporate secretary and in
personnel matters.   Thus, plaintiff has sufficiently established a
*prima facie* showing that, as Skinner's successor (although at a
lower corporate rank), she assumed and performed substantially all
of the duties he had performed, yet was paid less.   In 1980,
Skinner was being paid $22,800 per year.[31]   After assuming Skinner's

---

[31] It is of no significance that plaintiff's comparator left
employment long before the period of time preserved for class

121

duties, the evidence fails to establish what plaintiff was paid in 1980, although records indicate that she received a raise to $13,500 in November 1981, a year and a half after taking over Skinner's duties. In any event it is clear that she was paid less for substantially the same work. Defendant has failed to articulate any legitimate reason for this disparity; therefore, plaintiff is entitled to recover the difference between her pay and that paid Skinner[32] from April 24, 1983 (the beginning of the class period), until her termination on July 30, 1984, plus interest. Unfortunately, plaintiff's personnel file and pay records have not been found, leaving the court and the parties with only scant evidence from which to calculate her back pay. As well as the

---

claims began on April 24, 1983, because her wage discrimination claim involved a "continuing violation." When she assumed Skinner's duties, but was paid substantially less than he was paid, plaintiff was subjected to illegal wage discrimination, which continued with every paycheck she received thereafter, even after Skinner left. See Brinkley-Obu v. Hughes Traning, Inc., 36 F.3d 336 (4th Cir. 1994); but see Snider v. Belvidere Township, 216 F.3d 616 (7th Cir. 2000). Plaintiff is limited to recovering, however, only the discriminatory disparity that accrued during the class period.

[32] The court concludes that to the extent plaintiff also seeks to recover for any difference between her pay and that paid Skinner when he returned to Alabama Federal in January 1984, she has failed to establish that Skinner's duties after that date were substantially similar to her own. She admits that when Skinner was re-employed in 1984, he held the position of Western Division president, a higher rank in the corporate structure. Skinner left Alabama Federal later in 1984, being replaced as Western Division president by Tom Wicks.

court can determine, the following chart sets forth the back pay plaintiff is entitled to recover:

| Date | Rate of Pay | Actual Pay | Pay Due[33] | Difference |
|------|-------------|------------|-------------|------------|
| 4/24/83 to 1/1/84 | $18,000 | $12,000[34] | $15,200 | $3,200 |
| 1/1/84 to 7/30/84 | $20,000 | $11,669 | $13,300 | $1,631 |
| | | | TOTAL BACK PAY: | $4,831 |

Thus, plaintiff Woodruff is entitled to recover $4,831 in back pay, plus interest.

<u>CONCLUSION</u>

In conclusion, by separate order, the court will enter judgment in favor of the defendant and against plaintiffs Merredith

---

[33]   The court recognizes that, ordinarily, employees could expect increases in pay over time. However, in calculating the difference between what plaintiff Woodruff was paid and what Skinner was paid, the court has no way of predicting whether or how large subsequent pay increases for Skinner might have been had he remained at the bank after 1980. His rate of pay when he left was $22,800 in 1980. To avoid sheer speculation about whether and how much such pay increases might have been, the court has calculated plaintiff's back-pay on the basis that she should have been paid the same as Skinner, which is the sum of $22,800 per year, known to have been his pay at the time he left.

[34] Because the class period began April 24, 1983, plaintiff is entitled to recover the difference in pay for only eight months in 1983; thus, the "actual pay" and the "pay due," to which it is compared, are calculated for only the last eight months of 1983. Similarly, the "actual pay" and "pay due" for 1984 are calculated for the first seven months because she was terminated at the end of July.

Moody Smith, Dorothy Gurley, Nancy J. Martin, Sharon Waine McQueen, Betty Putman, Shirley Williams, Mary Hill, and Jean Bryant Piersol.

Plaintiff Lacy is entitled to recover the sum of $12,960 in back-pay, plus interest.

Plaintiff Figg is entitled to recover the sum of $17,500 in back-pay, plus interest.

Plaintiff Robertson is entitled to recover the sum of $11,850 in back-pay, plus interest.

Plaintiff Liddy is entitled to recover the sum of $30,689 in back-pay, plus interest.

Plaintiff Woodruff is entitled to recover the sum of $4,831 in back pay, plus interest.

Because the foregoing plaintiffs are entitled to interest on their back-pay awards, the parties are hereby DIRECTED to meet and confer in an attempt to stipulate the amount of interest attributable to each award. The parties are to report to the court within twenty (20) days after this order whether they can so stipulate to the amount of interest that should be included in the judgment for each prevailing plaintiff. Such a stipulation will be without prejudice to the right of any party to challenge on appeal the court's underlying findings of fact, conclusions of law, or calculation of the back-pay awards. If the parties are unable to so stipulate, the court will conduct further proceedings prior to the entry of a final judgment.

124

It is further ORDERED that, within thirty (30) days following entry of this Order, counsel for the **prevailing plaintiffs** shall submit to the court and file with opposing counsel their application for an award of attorneys' fees and costs in this action. Defendant may respond to that application within thirty (30) days after the date it is served.

The Clerk is DIRECTED to forward a copy of these findings of fact and conclusions of law to all counsel of record.

DONE this ___25th___ day of January, 2001.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE